573 A.2d 909

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
RICHARD JOHNSON, A/K/A RICHARD JONES,
DEFENDANT–APPELLANT.

Argued November 28, 1989—Decided May 21, 1990.

640

*James K. Smith, Jr.,* Deputy Public Defender, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney).

*Joseph Connor, Jr.,* Assistant Prosecutor, argued the cause for respondent (*Lee S. Trumbull,* Morris County Prosecutor, attorney).

The opinion of the Court was delivered by

POLLOCK, J.

This appeal concerns the suppression of evidence of the escape of defendant, Richard Johnson, from police headquarters and of his subsequent telephone call to the police. The Law Division granted defendant's motion to suppress. In an unreported decision, the Appellate Division reversed. We granted defendant's motion for interlocutory appeal, 117 *N.J.* 651, 569 *A.*2d 1347 (1989), and now reverse the judgment of the Appellate Division.

I

Except where otherwise indicated, the following statement is based on facts as found by the trial court or as conceded by the State. At 10:55 a.m. on July 25, 1984, Investigator Mark Prach of the Morris County Prosecutor's Office, accompanied by investigators Dempsey and Walsh of that office, and Detective Albert Stearn of the Jefferson Township Police Department, apprehended defendant, Richard Johnson, at a warehouse where he was working in Hanover Township. According to the police, defendant was not a suspect at the time, and they did not inform him of his constitutional rights. The trial court concluded, however, that from that moment "defendant was not

free to leave," and that he was "in detention." The police drove Johnson in a police car to the Jefferson Township headquarters where, according to the trial court, "defendant was subjected to an unlawful investigatorial detention." As the court found, once defendant entered the detective bureau at police headquarters, "that room was as good as a cell."

When they detained Johnson, the police were aware of the following facts. Around 6:00 p.m. on July 24, the dead body of eleven-year-old Dawn Kiemel was discovered on Espanong Road in Jefferson Township. Earlier that morning at 1:01, Dawn's father had called police headquarters to report that his· daughter had not returned from a carnival in the township, where she had gone with some friends. Two hours earlier, between 11:00 and 11:30 p.m., on July 23, a motorist had noticed a girl who looked like Dawn walking along Espanong Road in the vicinity where Dawn's body was discovered. About one or two hundred feet farther down the road, the motorist also noticed a black man built "like a football player," standing near a cream- or beige-colored car. Also on the evening of July 23–24, shortly after midnight, a large black man had driven his light-colored car off Espanong Road a few miles from the place where Dawn's body was found. The accident report listed the owner of the disabled vehicle as "Richard Jones," but police investigation revealed that the owner's true name was Richard Johnson, a man convicted of manslaughter in 1980 and recently placed on parole. Armed with these facts, the township and county law-enforcement officials detained defendant, who fit the description provided by the motorist and who, in fact, was the owner of the disabled car.

On arriving at police headquarters, the officials began interrogating Johnson without first informing him of his rights to counsel or to remain silent. After two hours of questioning, Stearn and Prach left the room, leaving Sergeant George Stamer to guard Johnson. With Stamer's permission, Johnson tried unsuccessfully to place telephone calls to his mother and to his girl friend. According to Stamer, Johnson then stated, "I think

I better call my attorney," but when Stamer told him to "go ahead," Johnson decided he did not yet need an attorney. The trial court ruled that Stamer's failure to ascertain whether Johnson was invoking his right to counsel at this time constituted a violation of Johnson's right to counsel.

A few minutes later, while pacing back and forth, Johnson announced, "I think I'm going to leave here now." Stamer, however, told Johnson to sit down and wait for Stearn. According to Johnson, when he opened the door to leave, his way was blocked by an assistant prosecutor. The trial court found that the prosecutor, perhaps "in conjunction with one of the officers," directed defendant "back into the detective room."

On returning, Stearn read Johnson his *Miranda* rights for the first time and asked him to sign a written "Advice of Rights Form." Johnson refused. In response to his inquiry, Johnson was told that he was not under arrest, but that he was a suspect. To this, Johnson replied, "[s]ince I'm a suspect, then I would like to have a lawyer." Stearn, however, told him that he did not need a lawyer and asked Johnson what was he "trying to hide." When reviewing the testimony, the trial court found that defendant's reply constituted a request for counsel.

The questioning resumed. That resumption, the trial court found, constituted another violation of defendant's right to counsel.

The police, knowing that Johnson had previously been convicted for aggravated manslaughter, asked him if he had ever been arrested. Johnson replied, "I plead the Fifth. I'm not saying nothing * * *."

The trial court found that Prach treated defendant's request as if it were a joke. As the court stated, Prach "thought the defendant was joking, that I guess he thought the defendant was just making light of what you see on television or when people say 'I plead the Fifth,' and Prach saw no significance to the defendant's statement that he 'pleads the Fifth.'"

Rejecting Prach's testimony as lacking "any credibility," the trial court concluded:

> Prach's discussion of the defendant pleading the Fifth was about as cavalier on the witness stand as though the defendant was asking him for a piece of gum. To hear and watch Prach testify as to this incident, any unknowing spectator in this courtroom could think that there was some sort of inside joke being recounted.

The court concluded: "Prach's testimony is nothing more or less than the extenuation of the course of [the] devious undoubtedly unsanctioned and most importantly unconstitutional approach he took to this case during the entire participation from the outset."

Ignoring Johnson's invocation of his constitutional rights, Prach and Stearn continued to question him. Johnson testified that in response to their statement that they knew of his manslaughter conviction, he suggested that they thought he was guilty because of his criminal record. When Stearn said, "maybe," Johnson replied, "maybe my ass. I want a lawyer."

At 4:20 p.m., after lunch and two hours of "small talk," Investigator Richard Longo of the Morris County Prosecutor's Office entered the room. He told Johnson that he was seeking warrants to search Johnson's car and trailer. According to Johnson, Longo said: "We know you killed this girl. * * * If I find what I'm looking for, I'm going for the death penalty." After Longo left, Johnson said to Stearn: "Don't you say nothing at all until I get a lawyer." The trial court found that Johnson's statement constituted another request for a lawyer.

According to Johnson, around 4:45 p.m. he observed his girl friend, Elizabeth Plant, as the police brought her to the station for questioning. At Johnson's request, Prach brought Plant into the room. As Johnson and Plant embraced, he whispered to her to "get me a lawyer" and passed her a note for his mother to the same effect.

Johnson asked for a lawyer several more times and indicated his unwillingness to continue talking. According to Johnson, Stearn assured him, "[y]ou're going to get your lawyer. We're

going to get you a lawyer." Johnson testified that at another point, however, Stearn told him, "[i]f you want a lawyer, it means you got something to hide."

One hour later, when Stearn left the room at 5:50, Prach resumed questioning Johnson, without re-administering *Miranda* warnings. Knowing that Johnson was on parole, Prach suggested that defendant did not want to discuss why he stopped on Espanong Road because he intended to commit a burglary. In a statement that was virtually a repetition of Prach's suggestion, Johnson responded "that [he] had stopped on Espanong Road to commit a burglary." The trial court found, "[t]he clear import of [Prach's suggestion] is that if Johnson doesn't tell about this minor crime * * * the defendant by his silence might end up getting charged and convicted of * * * the homicide of Dawn Kiemel."

Johnson testified that Stearn soon returned and informed him that he had "just called an attorney, who was on his way." Although the record does not indicate whether Stearn had in fact placed the call, no attorney ever arrived. The trial court found that Prach and Stearn then resumed questioning Johnson about the "burglary." Johnson testified that he again asked for a lawyer. To that request, Stearn replied, "[d]on't worry about it, you don't need a lawyer * * *."

At 8:00 p.m., after being in custody at the police station for eight and one-half hours, Johnson heard over the intercom that his mother was calling. Prach told Johnson that he could speak to his mother after the police spoke to her first. Johnson explained to the police that he had earlier passed to Plant a note for his mother so she would obtain a lawyer for him. The police responded by telling Johnson that "we're getting a lawyer."

In what he described as a "fired-up mood," Johnson testified that he protested: "I've been here going on nine hours, and I can't speak to my mother?" When Prach tried to resume questioning, Johnson stated that he objected: "Man, shut up.

I'm not saying nothing, man. You said I can't speak to my mother. You ain't got me a lawyer. I ain't saying nothing."

Stearn left the room, and Prach, who noticed that Johnson was "getting upset," repeatedly suggested, over Johnson's denials, that he must have seen "the girl" on Espanong Road. Johnson succinctly described the ensuing events:

> Then, he [Prach] says: Listen, Rich, maybe you seen something, maybe you heard something, but you don't want to tell us.
>
> I said: Man, I am not saying nothing. Don't ask me no more, don't ask me nothing else. I keep telling you, like I said, I keep telling you not to ask me no questions, man. But you keep asking me questions.
>
> He said: Well, I think you did it. I said: You think I did it? He said: Yeah. And I just, boom, went through the window.

Crashing through a plate glass window one-quarter to one-half inches thick, Johnson ran into the woods and escaped. According to Johnson, "what really kicked it off" was that the police would not let him talk to his mother or have a lawyer. The trial court found that "the impetus for him jumping out of the window was that his mother had called and he wasn't allowed to speak to his mother. Within, certainly less than two minutes, three minutes, out the window he goes * * *."

Approximately two hours later, Johnson called Prach from a pay telephone, apologized for breaking the window, and stated that he hoped Prach was not hurt and would not get into trouble. When Prach told Johnson "I think you should turn yourself in," Johnson replied: "Well, once I get a lawyer, then, I'll turn myself in."

Forty hours later, accompanied by a lawyer, Johnson surrendered to the authorities at the offices of the Asbury Park Press. The police assured Johnson's lawyer, Charles Moriarty, that they would take Johnson to the Morris County jail and that they would not question him. They broke both promises. Consequently, in a separate proceeding, the trial court suppressed certain statements made by Johnson to the police as violative of his right to counsel. The suppression of those

statements, like the suppression of Johnson's statements at police headquarters, is not before us on this appeal.

Concerning his escape from the Jefferson Township police headquarters, a Morris County Grand Jury indicted Johnson for escape, *N.J.S.A.* 2C:29–5, and fourth-degree criminal mischief, *N.J.S.A.* 2C:17–3, for breaking the window and fleeing from the police station. On October 10, 1984, pursuant to a plea agreement, Johnson pled guilty to criminal mischief and disorderly conduct, *N.J.S.A.* 2C:33–2a(2), and received concurrent sentences of nine months and thirty days, respectively.

Seven months later, on May 7, 1985, a Morris County Grand Jury indicted Johnson on five counts arising out of the death of Dawn Kiemel: knowing and purposeful murder, *N.J.S.A.* 2C:11–3a(1) and –3a(2); felony murder, *N.J.S.A.* 2C:11–3a(3); kidnapping, *N.J.S.A.* 2C:13–1b(1) and –1b(2); aggravated sexual assault, *N.J.S.A.* 2C:14–2a; and possession of a weapon with intent to use it unlawfully against another, *N.J.S.A.* 2C:39–4d. On May 17, the prosecutor filed a notice of aggravating factors, notifying the defendant that he would seek the death penalty.

Johnson moved to suppress the statements he had made while in custody on July 25 and 27, 1984. Finding violations of the New Jersey Constitution and of the fourth, fifth, and sixth amendments to the United States Constitution, the trial court suppressed all of Johnson's statements. The court found that Johnson was "not free to leave" when the police asked him to accompany them to police headquarters. This detention, the trial court ruled, triggered the protection of defendant's constitutional rights. The court explained "that the fourth amendment was meant to [prevent] wholesale intrusions upon the personal security of silence, whether these intrusions be deemed to be arrest or investigatory detention." Relying on *Dunaway v. New York*, 442 *U.S.* 200, 99 *S.Ct.* 2248, 60 *L.Ed.*2d 824 (1979), the court explained that *"Dunaway* stands for the proposition that detention for custodial interrogation, regardless of the label that is placed on it, is an intrusion on the

interests protected by the fourth amendment and it will trigger the traditional safeguards against illegal arrest." Because the police had violated Johnson's fourth-amendment rights by detaining him without probable cause, the court suppressed all statements resulting from the detention.

In addition, the court ruled that the statements were inadmissible under the fifth and sixth amendments. The trial court found that Johnson had requested an attorney several times and that his right to counsel "was trampled upon and * * * disregarded as though it was some trivial request." Compounding matters, the police had questioned Johnson alone even after he had retained a lawyer. This led the trial court to conclude that the police had flagrantly and blatantly violated Johnson's constitutional rights.

The Appellate Division affirmed, holding that the trial court's decision did not apply to Johnson's telephone call to Prach after his escape. Without reaching the issue of the fourth-amendment violations, the court found that the police committed "wholesale violations of defendant's rights under the fifth and sixth amendments." The State did not seek leave to appeal.

Immediately after the trial court had suppressed his statements, Johnson filed the subject motion to prevent the State "from using, in any way, facts surrounding the defendant's departure from Jefferson Township Police Department on July 25, 1984." The trial court granted the motion, suppressing the facts of both Johnson's escape and of his telephone call. It also denied the State's motion to submit further evidence on the issue of probable cause to arrest. In reaching those results, the court held that Johnson's escape was the "fruit of the poisonous tree," because it was the "proximate result of the illegal detention." The court expressly based its ruling on the violation of Johnson's rights under the fourth amendment. Citing the refusal of the police to allow Johnson to talk with his mother about a lawyer, the court ruled that admission of the

evidence would permit the police to "benefit by their own wrongdoing."

Alternatively, the court suppressed the evidence on the grounds that it would violate the plea agreement underlying Johnson's criminal-mischief and disorderly-person convictions. This ruling occurred because an issue arose about the scope of the plea bargain. The State agreed that it could not use the convictions for the purposes of impeachment, but claimed that the parties had agreed that "counsel for both sides could go into the facts of what occurred on that particular day." Although the court acknowledged that its recollection did not "vary" significantly from that of the State, the attorneys who represented Johnson at the plea hearing could not recall any such agreement. The plea agreement itself was silent. Ultimately, the court suppressed evidence of the facts surrounding the escape because that evidence would undermine the agreement not to use the convictions.

On the State's appeal, the Appellate Division reversed the suppression of the evidence. Initially, it found "that the trial judge had misinterpreted the plea agreement." According to the Appellate Division, "the agreement shows that defendant waived his right to contest the admissibility of the escape evidence since the terms of the plea bargain 'must be meticulously carried out.'" (citation omitted.)

The court noted that its earlier decision upholding the suppression of Johnson's statements was based on the violation of his fifth- and sixth-amendment rights. Without expressly identifying the constitutional provision under which it was analyzing those rights, the court apparently adopted the fourth-amendment analysis employed by the trial court.

Although critical of the police conduct, the court concluded that "other factors * * * weigh against exclusion." It held that "the escape and resulting telephone call were sufficiently insulated from the illegal detention as to avoid the initial taint."

Finally, the court affirmed the order barring the State from adducing further evidence to establish probable cause to arrest. The State, however, did not seek leave to appeal from that order.

Judge Shebell filed a partial dissent. He found that Johnson had not waived his right to contest the admissibility of the facts surrounding the escape. In his view, the State merely had reserved its right to try to introduce the underlying evidence. He found that the plea agreement prevented the State from introducing evidence of the convictions, but not of those facts. Although he agreed with the majority in rejecting the trial court's "fruit of the poisonous tree" analysis, he favored a remand for further inquiry whether the escape was "the product of the illegal activity of the police" or of Johnson's independent, voluntary act. He agreed with the majority that the post-escape telephone call was admissible.

## II

The prohibition of murder and other violent acts reflects society's concern for protection against criminal behavior. Ordinarily, the public relies on law-enforcement officers to prevent such behavior. Consequently, those officers are entrusted with powers not possessed by the general public, such as the power to arrest and interrogate. When exercising those powers, however, law-enforcement officers are circumscribed by cherished constitutional rights of every citizen. Those rights include freedom from arrest or seizure without probable cause, *U.S. Const.* amend. IV; *N.J. Const. of 1947* art. I, § 7; the right to counsel, *U.S. Const.* amends. V & VI; *N.J. Const. of 1947* art. I, § 10; and the right to remain silent when accused of a crime, *U.S. Const.* amend. V; *cf. State v. Hartley*, 103 *N.J.* 252, 281, 511 *A.*2d 80 (1986) (recognizing common-law privilege against self-incrimination). Police may not arrest someone on a mere whim or suspicion. Neither may they coerce, either through physical abuse or oppressive interrogation, someone to

testify involuntarily against himself or herself. The right to counsel, moreover, assures a citizen, who may be unfamiliar with the intricacies of criminal procedure, of access to legal advice from the moment of arrest. As a result, a violation of those rights is not a mere technicality, but a breach of the basic compact between the people and the state.

■ To redress such violations, evidence obtained in violation of a defendant's federal- or state-constitutional rights is generally excluded as proof against the defendant. *Edwards v. Arizona,* 451 *U.S.* 477, 485, 101 *S.Ct.* 1880, 1885, 68 *L.Ed.*2d 378, 387 (1981) (fifth-amendment right to counsel); *Michigan v. Mosley,* 423 *U.S.* 96, 104, 96 *S.Ct.* 321, 326, 46 *L.Ed.*2d 313, 321 (1975) (fifth-amendment right to remain silent); *Miranda v. Arizona,* 384 *U.S.* 436, 479, 86 *S.Ct.* 1602, 1630, 16 *L.Ed.*2d 694, 726 (1966) (both fifth-amendment right to remain silent and right to attorney during custodial interrogation); *Massiah v. United States,* 377 *U.S.* 201, 206, 84 *S.Ct.* 1199, 1203, 12 *L.Ed.*2d 246, 250 (1964) (sixth-amendment right to counsel); *Weeks v. United States,* 232 *U.S.* 383, 393, 34 *S.Ct.* 341, 344, 58 *L.Ed.* 652, 656 (1914) (fourth-amendment right to be free of unreasonable searches and seizures); *State v. Novembrino,* 105 *N.J.* 95, 157, 519 *A.*2d 820 (1987) (article I, section 7 right to be free of unreasonable searches and seizures); *Hartley, supra,* 103 *N.J.* at 282, 511 *A.*2d 80 (state common-law right to freedom from compelled self-incrimination). The purpose of the exclusionary rule is to deter police misconduct and to preserve the integrity of the courts. *Brown v. Illinois,* 422 *U.S.* 590, 599, 95 *S.Ct.* 2254, 2259, 45 *L.Ed.*2d 416, 424–25 (1975); *Wong Sun v. United States,* 371 *U.S.* 471, 486, 83 *S.Ct.* 407, 416, 9 *L.Ed.*2d 441, 454 (1963); *State v. Barry,* 86 *N.J.* 80, 87, 429 *A.*2d 581, *cert. denied,* 454 *U.S.* 1017, 102 *S.Ct.* 553, 70 *L.Ed.*2d 415 (1981).

■ For seventy years, the United States Supreme Court has recognized that "[t]he essence of a provision forbidding the acquisition of evidence in a certain way is that not merely the

evidence so acquired shall not be used before the Court but that it shall not be used at all." *Silverthorne Lumber Co. v. United States,* 251 *U.S.* 385, 392, 40 *S.Ct.* 182, 183, 64 *L.Ed.* 319, 321 (1920). Although usually applied to evidence obtained as the result of illegal searches and seizures, this rule also applies to evidence obtained in violation of a defendant's fifth- and sixth-amendment rights. *Nix v. Williams* 467 *U.S.* 431, 442, 104 *S.Ct.* 2501, 2508, 81 *L.Ed.*2d 377, 386 (1984) (sixth-amendment right to counsel); *see also Kastigar v. United States,* 406 *U.S.* 441, 453, 92 *S.Ct.* 1653, 1661, 32 *L.Ed.*2d 212, 222 (1972) (fifth-amendment prohibits both use and derivative use of compelled testimony under grant of immunity); *cf. Oregon v. Elstad,* 470 *U.S.* 298, 308, 105 *S.Ct.* 1285, 1292, 84 *L.Ed.*2d 222, 231 (1985) (stating *in dicta* that this rule applies to violation of any of defendant's constitutional rights). Consequently, illegally-seized evidence is excluded whether it is obtained directly or indirectly. *Wong Sun, supra,* 371 *U.S.* at 486, 83 *S.Ct.* at 416, 9 *L.Ed.*2d at 453. Indirectly-obtained evidence is excluded as "the fruit of the poisonous tree." *Id.* at 487–88, 83 *S.Ct.* at 417, 9 *L.Ed.*2d at 455. Such evidence may not be introduced on the prosecution's case-in-chief unless it has been obtained "by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488, 83 *S.Ct.* at 417, 9 *L.Ed.*2d at 455 (quoting Maguire, *Evidence of Guilt* 221 (1959)).

The same result follows from an analysis of state law. Indeed, we have excluded a second confession as the "fruit of the poisonous tree" when law-enforcement authorities obtained an initial confession in violation of the defendant's common-law privilege against self-incrimination. *Hartley, supra,* 103 *N.J.* at 283, 511 *A.*2d 80; *cf. State v. Bey I,* 112 *N.J.* 45, 73–74, 548 *A.*2d 846 (1988) (written confession obtained twenty minutes after involuntary oral confession inadmissible, notwithstanding intervening waiver of *"Miranda* rights"); *Barry, supra,* 86 *N.J.* at 87–89, 429 *A.*2d 581 (confession after an arrest without probable cause admissible because "intervening circumstances

which preceded defendant's confession effectively purged the taint of his illegal arrest.").

Under either state or federal law, the critical determination is whether the authorities have obtained the evidence by means that are sufficiently independent to dissipate the taint of their illegal conduct. *Brown, supra,* 422 *U.S.* at 603, 95 *S.Ct.* at 2261, 45 *L.Ed.*2d at 427; *Hartley, supra,* 103 *N.J.* at 283, 511 *A.*2d 80; *Barry, supra,* 86 *N.J.* at 87, 429 *A.*2d 581. In making that determination, the test is not whether the authorities would have failed to obtain the challenged evidence "but for" their illegal conduct. *Barry, supra,* 86 *N.J.* at 87, 429 *A.*2d 581. The test followed by both federal and New Jersey courts is based on three factors: (1) the temporal proximity between the illegal conduct and the challenged evidence; (2) the presence of intervening circumstances; and (3) the flagrancy and purpose of the police misconduct. *Brown, supra,* 422 *U.S.* at 603–04, 95 *S.Ct.* at 2261–62, 45 *L.Ed.*2d at 427; *State v. Worlock,* 117 *N.J.* 596, 622, 569 *A.*2d 1314 (1990); *Hartley, supra,* 103 *N.J.* at 283, 511 *A.*2d 80; *see Barry, supra,* 86 *N.J.* at 87, 429 *A.*2d 581. Ultimately, the determination whether the evidence is the "fruit" of the illegal conduct is a factual matter for the court. *Brown, supra,* 422 *U.S.* at 604 n. 10, 95 *S.Ct.* at 2262 n. 10, 45 *L.Ed.*2d at 427 n. 10; *see Dunaway, supra,* 442 *U.S.* at 218, 99 *S.Ct.* at 2259, 60 *L.Ed.*2d at 839; *Worlock, supra,* 117 *N.J.* at 625, 569 *A.*2d 1314.

Relying on *Brown v. Illinois, supra,* 422 *U.S.* 590, 95 *S.Ct.* 2254, 45 *L.Ed.*2d 416, the Appellate Division cited four reasons for not excluding the evidence: the escape was not spontaneous; the refusal of the officials to let Johnson talk to his mother was not an impetus for his escape; the police did not physically abuse Johnson; and the telephone call was untainted because Johnson was not in custody at the time he called Prach. To reach that result, the court rejected the factual findings of the trial court and misapplied the *Brown* test. In both respects, the court erred.

A

When considering the three *Brown* factors, the first, temporal proximity between the illegal police conduct and the evidence, may be ambiguous. *Dunaway, supra*, 442 *U.S.* at 220, 99 *S.Ct.* at 2260–61, 60 *L.Ed.*2d at 841 (Stevens, J., concurring); *Worlock, supra*, 117 *N.J.* at 622–23, 569 *A.*2d 1314. A long detention, like a short one, may compound the taint of an illegal arrest. *Ibid.* Consequently, state and federal courts have applied the "fruits" doctrine to exclude evidence after lengthy detentions.

In *Taylor v. Alabama*, 457 *U.S.* 687, 102 *S.Ct.* 2664, 73 *L.Ed.*2d 314 (1982), the Supreme Court excluded a confession obtained fourteen hours after defendant had been arrested illegally. After considering that defendant was in police custody, unrepresented by counsel, questioned on several occasions, fingerprinted, and subjected to a lineup, *id.* at 691, 102 *S.Ct.* at 2667, 73 *L.Ed.*2d at 320, the Court concluded that the length of the detention did not dissipate the taint. Other courts have excluded evidence obtained after much longer detentions. *People v. White*, 117 *Ill.*2d 194, 223–224, 111 *Ill.Dec.* 288, 298, 512 *N.E.*2d 677, 688 (1987) (a long detention by itself may impel a defendant to confess), *cert. denied*, 485 *U.S.* 1006, 108 *S.Ct.* 1469, 99 *L.Ed.*2d 698 (1988); *State v. Weekes*, 268 *N.W.*2d 705, 709 (Minn.1978) (detention of thirty-four hours compounds the illegality of the arrest).

Thus, the Appellate Division erred in relying on the ten-hour length of Johnson's detention to find a lack of temporal proximity between it and Johnson's escape. Contrary to the ruling of the Appellate Division, exclusion of the evidence does not depend on whether the escape was a "spontaneous response" to the illegal police conduct. Here, moreover, the escape occurred only after Johnson had been questioned for ten hours, during which time the police repeatedly violated his rights.

In contrast to the Appellate Division, the trial court found, "[a]n individual is being unlawfully detained and he doesn't

jump out of the window for no reason at all. The impetus for his jumping out of the window was that his mother had called and he wasn't allowed to speak to his mother." The court added that Johnson had focused on retaining a lawyer and on his mother as the one person most likely to retain one. From this, the court concluded that denying Johnson the opportunity to speak to his mother was the "proximate cause" of his escape.

Although the trial court did not expressly employ the tri-partite *Brown* analysis, it made the necessary findings of fact from a "record of amply sufficient detail and depth from which the determination may be made." 422 *U.S.* at 604, 95 *S.Ct.* at 2262, 45 *L.Ed.*2d at 427. Contrary to the State's contention at oral argument, this determination is not for the jury, but for the court. *Ibid.* n. 10; *Worlock*, 117 *N.J.* at 625, 569 *A.*2d 1314.

The record provides substantial support for the trial court's finding that Johnson wanted to talk to his mother to obtain a lawyer. One need not be a constitutional scholar to appreciate an arrestee's right to counsel. Every television viewer understands that the police must inform an arrestee of his or her right to counsel and, if he or she is indigent, to the appointment of assigned counsel. Here, the denial of Johnson's request to speak to his mother was an extension of the denial of his right to counsel. That denial, as the trial court found, precipitated defendant's flight.

In many, if not most, situations the denial of the opportunity to speak to a family member would not justify an escape from custody. Even here, Johnson's escape constituted a separate offense, one to which he pled guilty and for which he has served a period of incarceration. The issue before us, however, is not whether Johnson should be punished for the escape, but whether he should be prejudiced in his trial for murder by the flagrant violations of his constitutional rights.

The Appellate Division to the contrary notwithstanding, the record amply supports the trial court's finding that the impetus for the escape was the denial of defendant's request to speak to

his mother, whom he expected to retain a lawyer. Not only was the trial court's finding not "clearly a mistaken one," *State v. Johnson*, 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964), it was solidly based on the record. By declaring that it found no support for that finding, the Appellate Division usurped the trial court's power to find facts. In sum, the Appellate Division should have affirmed the trial court's conclusion that Johnson's escape was prompted by the relentless violation of his constitutional rights.

The same analysis applies to Johnson's telephone call, which was inextricably intertwined with the escape. *See Bey I, supra*, 112 *N.J.* at 73–74, 548 *A.*2d 846; *Hartley, supra*, 103 *N.J.* at 279, 511 *A.*2d 80. Only two hours after escaping, Johnson telephoned Prach to apologize for breaking the window and to say that he would surrender as soon as he had obtained a lawyer. Forty hours later, after retaining counsel, Johnson surrendered to the police. Thus, the escape was not an attempt to avoid apprehension, but, as the trial court found, an attempt to flee "the premises to get a lawyer." That finding undercuts the contrary finding of the Appellate Division that evidence of the telephone call was untainted because at the time he placed the call, Johnson was not in custody.

### B

The second factor, intervening events, "can be the most important factor in determining whether [evidence] is tainted." *Worlock, supra*, 117 *N.J.* at 623, 569 *A.*2d 1314. Identifying such a factor, however, "can be difficult." *Ibid.* "In the face of egregious police conduct, the State should show some 'demonstrably effective break in the chain of events leading from the illegal arrest to the [evidence], such as actual consultation with counsel or the accused's presentation before a magistrate for a determination of probable cause.'" *Id.* (quoting *Brown, supra*, 422 *U.S.* at 611, 95 *S.Ct.* at 2265, 45 *L.Ed.*2d at 432 (Powell, J., concurring)) at 623–24, 569 *A.*2d 1314 (citations omitted).

When analyzing intervening circumstances in this case, the Appellate Division cited several out-of-state cases for the proposition that the escape itself was an intervening act admissible to prove Johnson's consciousness of guilt. As a matter of logic alone, the argument is fallacious: the escape cannot be a factor that intervenes between itself and the illegal police conduct. In each case cited by the Appellate Division, moreover, the police made an illegal arrest without probable cause and, in apprehending the defendant after his escape, found evidence that incriminated him either for the escape or for a new offense. When holding that the incriminating evidence was admissible to prove the new offense, the courts understandably held that the escape itself was an intervening circumstance between the illegal detention and that evidence. *United States v. Bailey*, 691 *F.*2d 1009, 1018–19 (11th Cir.1982) (defendant recaptured after flight following drug-courier-profile stop; drugs found during search properly admitted), *cert. denied*, 461 *U.S.* 933, 103 *S.Ct.* 2098, 77 *L.Ed.*2d 306 (1983); *United States v. Garcia*, 516 *F.*2d 318, 320 (9th Cir.) (defendant fled after being stopped by the Border Patrol; fifty-five pounds of marijuana, found in trunk after agents pulled defendant over after high-speed chase and determined defendant was illegal alien, held admissible), *cert. denied sub nom. Martinez–Lopez v. United States*, 423 *U.S.* 934, 96 *S.Ct.* 290, 46 *L.Ed.*2d 265 (1975); *United States v. Nooks*, 446 *F.*2d 1283, 1287–88 (5th Cir.) (defendant fled after being stopped by sheriff without probable cause; subsequent arrest valid because defendant's flight at 115 miles per hour and his shooting at sheriff created untainted probable cause to arrest), *cert. denied sub nom. Hughes v. United States*, 404 *U.S.* 945, 92 *S.Ct.* 299, 30 *L.Ed.*2d 261 (1971); *People v. Perez*, 123 *A.D.*2d 791, 792, 507 *N.Y.S.*2d 264, 265 (1986) (defendant's act of walking away from police and dropping gun behind bushes was "independent act involving a calculated risk" rather than spontaneous reaction to illegal arrest); *State v. Jacobson*, 398 *So.*2d 857, 859 (Fla.Dist.Ct.App.1981) (defendant fled after illegal drug-courier-profile stop; drugs found during search, on

recapture, held admissible); *mod. on other grounds*, 476 *So.*2d 1282 (1985). In none of these cases, however, was the incriminating evidence admitted to establish the offense for which the defendant had been illegally detained. In brief, the cases are irrelevant to the question before us, whether the State may use the fact of Johnson's escape in his trial for murder, the offense for which he was illegally detained. The cases are relevant only to the offenses committed during or subsequent to Johnson's escape.

Here, the only intervening events were the repeated violations of defendant's constitutional rights. The violation of those rights after the administration of *Miranda* warnings did not break, but rather forged, the chain of causation between the police misconduct and the escape. Even without the subsequent violations, it is doubtful that the reading of those warnings and defendant's brief meeting with his girl friend would have broken the chain of causation. *See Taylor, supra,* 457 *U.S.* at 691, 102 *S.Ct.* at 2667, 73 *L.Ed.*2d at 320; *Dunaway, supra,* 442 *U.S.* at 217, 99 *S.Ct.* at 2259, 60 *L.Ed.*2d at 839; *Brown, supra,* 422 *U.S.* at 603, 95 *S.Ct.* at 2262, 45 *L.Ed.*2d at 427 (*Miranda* warnings permit finding that subsequent confession was voluntary, but this type of "voluntariness" is merely threshold requirement under "fruits" analysis).

## C

The most striking feature of this case centers on the third factor, the flagrancy and purpose of the police misconduct. Described by the trial court as "a tragedy of errors," the Appellate Division found the misconduct to be "antediluvian" and to constitute "wholesale violations of defendant's rights under the Fifth and Sixth Amendments * * *." No matter how characterized, the facts reveal numerous violations of defendant's constitutional rights from his detention through his escape. Before us, the State does not dispute that it violated

those rights. Instead, it focuses on the causal connection between those violations and defendant's flight.

In light of the State's concession, we need not dwell on the violations, except to note that they began with the unlawful detention, extended through the failure to administer *Miranda* warnings, and culminated in the transgressions of defendant's rights to remain silent and to counsel. In sum, defendant was the victim of a continuum of police misconduct.

## D

Notwithstanding the violations of defendant's constitutional rights, the Appellate Division concluded that the failure to admit evidence of the escape would shield defendant from the consequences of his illegal act. In reaching that result, the court quoted approvingly from *United States v. Bailey,* that suppression would "virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." 691 *F.*2d 1009, 1017 (11th Cir.1982). Johnson, however, does not seek immunity from prosecution for his escape. As previously noted, he has already pled guilty and been sentenced to ten months in jail for the two offenses arising out of the escape.

We likewise reject the State's contention that evidence of defendant's escape and telephone call are admissible because they were voluntary. Voluntariness is merely a threshold requirement. *Dunaway, supra,* 442 *U.S.* at 219, 99 *S.Ct.* at 2260, 60 *L.Ed.*2d at 840; *Brown, supra,* 422 *U.S.* at 602, 95 *S.Ct.* at 2261, 45 *L.Ed.*2d at 426. Even if Johnson acted voluntarily, evidence of the escape and telephone call should be suppressed because the State has not purged the evidence of the taint of its own illegal conduct.

Contrary to the State's contentions, the absence of physical abuse does not advance the argument in favor of admission of the evidence. *Dunaway, supra,* 442 *U.S.* at 218–19, 99 *S.Ct.* at 2260, 60 *L.Ed.*2d at 840. The rights of the public to be free

from the unwarranted use of power by law-enforcement officials would be in a sorry state if evidence obtained in violation of a citizen's constitutional rights were admissible merely because the citizen had not been subjected to physical abuse. Deterrence of police misconduct is not limited to the prevention of physical abuse. Excluding evidence serves to enforce a defendant's right to be free from unreasonable searches and seizures, *Wong Sun, supra,* 371 *U.S.* at 486, 83 *S.Ct.* at 416, 9 *L.Ed.*2d at 454; to be free from compelled self-incrimination, *Mosley, supra,* 423 *U.S.* at 104, 96 *S.Ct.* at 326, 46 *L.Ed.*2d at 321; and to counsel, *Massiah, supra,* 377 *U.S.* at 206, 84 *S.Ct.* at 1203, 12 *L.Ed.*2d at 250. Without some form of deterrence, police violations of those rights could reduce constitutional protections to a nullity. *Cf. Weeks, supra,* 232 *U.S.* at 393, 34 *S.Ct.* at 344, 58 *L.Ed.* at 656 ("If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the 4th amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution.").

We reach the same result under an independent analysis of state law. The New Jersey Constitution expressly prohibits searches and seizures without probable cause. *N.J. Const. of 1947* art. I, § 7; *Novembrino, supra,* 105 *N.J.* at 205, 519 *A.*2d 820; *State v. Valencia,* 93 *N.J.* 126, 141, 459 *A.*2d 1149 (1983); *State v. Hunt,* 91 *N.J.* 338, 348, 450 *A.*2d 952 (1982); *State v. Fariello,* 71 *N.J.* 552, 558–59, 366 *A.*2d 1313 (1976); *State v. Macri,* 39 *N.J.* 250, 266, 188 *A.*2d 389 (1963); *State v. Valentin,* 36 *N.J.* 41, 43, 174 *A.*2d 737 (1961). It also guarantees criminal defendants the right to counsel. *N.J. Const. of 1947* art. I, § 10. Although the State Constitution does not contain a right against self-incrimination, that right exists under the common law. *Hartley, supra,* 103 *N.J.* at 286, 511 *A.*2d 80. When assessing violations of that right, we have employed the three-part *Brown* test, *Worlock, supra,* 117 *N.J.* at 622, 569 *A.*2d

1314; *Hartley, supra,* 103 *N.J.* at 283, 511 *A.*2d 80, not because we are bound to follow it, but because we have elected to receive the benefit of its guidance, *Michigan v. Long,* 463 *U.S.* 1032, 1041, 103 *S.Ct.* 3469, 3476, 77 *L.Ed.*2d 1201, 1214 (1983); *Hartley, supra,* 103 *N.J.* at 286, 511 *A.*2d 80.

To summarize, under both state and federal law, the evidence of Johnson's escape and telephone call must be excluded. Defendant's escape followed repeated violations of his constitutional rights over a ten-hour detention and immediately after he was denied his last chance to obtain a lawyer. No mitigating circumstances intervened between the police misconduct and defendant's escape. Only by excluding evidence of the escape and telephone call can we deter such reprehensible misconduct and preserve the integrity of the judicial system.

### III

■ We next turn to the effect of the plea agreement on the admissibility of the facts of the escape and telephone call. Notwithstanding its agreement not to use the convictions for escape and disorderly conduct to impeach defendant's credibility, the State now seeks to use evidence of the underlying facts for impeachment purposes.

The trial court excluded that evidence because admission would be inconsistent with the agreement barring use of the convictions. As the trial court stated, "I don't see how you can possibly produce * * * testimony * * * that defendant called up and said, I'm sorry I broke your window * * * without the jury concluding that he must have committed some crime at the police station."

Over Judge Shebell's dissent, the Appellate Division reversed, finding that in the plea agreement defendant had waived the right to challenge the evidence.

In reviewing the conflicting positions of the lower courts, we begin with the agreement and defendant's plea. Neither indicates that defendant waived his right to challenge the

admission of evidence of underlying facts. The only relevant references in the agreement are defendant's answers to questions three and four on the plea form. In answer to a question inquiring whether "any other promises, recommendations, or inducements had been made to [him] by the prosecutor or anyone else concerning this plea of guilty," defendant wrote, "[p]etty disorderly persons charge + criminal mischief charge to run concurrent to each other." Defendant denied in writing that anyone had "threaten[ed]" or "force[d] [him] in any way to cause [him] to offer this plea of guilty."

According to the State, its agreement not to use the conviction left it free "to use the facts of the [escape] at the subsequent trial on the homicide." The attorney who represented Johnson when he pled guilty, however, did not recall that the State retained the right to refer to the underlying facts. At one point in the suppression hearing, the trial court indicated that its recollection was consistent with that of the State. At another point, however, it said that the agreement barring use of the conviction did not imply "that the factual basis or anything that the defendant said was part of the overall plea bargain." The court's ultimate order of suppression supports the proposition that it believed that defendant had not waived the right to challenge the evidence. Nothing in the record indicates that Johnson personally waived the right to challenge the admission of evidence of the underlying facts.

Although we agree that the terms of a plea agreement "must be meticulously carried out," *State v. Jones*, 66 *N.J.* 524, 525–26, 333 *A.*2d 529 (1975), we conclude that the Appellate Division misapplied that proposition. Under *Rule* 3:9–3(b), a plea agreement shall be placed on the record in open court at the time the plea is entered. Here, the agreement as reflected in the plea form does not contain any waiver of Johnson's right to challenge the underlying evidence. Meticulous enforcement of the agreement, therefore, counsels against finding any such waiver.

Furthermore, we recently wrote, "[i]t is axiomatic in plea bargaining that all material terms and relevant circumstances be clearly disclosed, fully understood, and knowingly and voluntarily accepted by the defendant." *State v. Warren,* 115 *N.J.* 433, 444, 558 *A.*2d 1312 (1988). We agree with Judge Shebell that "[i]f a defendant is to waive a fundamental right, it must be placed upon the record and his full understanding of the waiver must be demonstrated in open court." Under the ambiguous circumstances surrounding defendant's plea, we are loathe to infer a waiver from a blank record. In sum, the State is precluded from impeaching defendant's credibility by recourse not only to the convictions but also to the underlying facts.

The judgment of the Appellate Division is reversed, and the matter is remanded to the Law Division.

*For reversal and remandment*—Chief Justice WILENTZ and Justices POLLOCK, CLIFFORD, HANDLER, O'HERN, GARIBALDI, and STEIN—7.

*Opposed*—None.