**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1521-17T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RICHARD A. BIJACSKO,

     Defendant-Appellant.

_____

Submitted November 27, 2018 – Decided July 3, 2019

Before Judges Rothstadt and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 16-09-0860.

Joseph E. Krakora, Public Defender, attorney for appellant (Molly O'Donnell Meng, Assistant Deputy Public Defender, of counsel and on the brief).

Scott A. Coffina, Burlington County Prosecutor, attorney for respondent (Alexis R. Agre, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Richard A. Bijacsko appeals from a judgment of conviction entered after a jury found him guilty of two third-degree offenses, possession of a weapon for an unlawful purpose and animal cruelty resulting in death. The primary issue before us is whether physical evidence, an axe, that defendant produced in direct response to custodial interrogation not preceded by Miranda[1] warnings should have been suppressed under State v. Mason, 164 N.J. Super. 1 (App. Div. 1979). Because we conclude the axe should have been suppressed under Mason, and its admission into evidence was not harmless error, we reverse the denial of defendant's motion to suppress the axe, vacate his conviction and sentence, and remand for a new trial in which the axe will not be admitted.

## I.

Two witnesses, Cheryl Mosca, the chief law enforcement officer for the Burlington County Society for the Prevention of Cruelty to Animals (SPCA), and Theresa Cooper, an SPCA animal cruelty investigator testified at a pretrial suppression hearing. The motion judge found that Mosca and Cooper were "credible" and "just very honest." We defer to those credibility findings. See

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

<u>State v. Locurto</u>, 157 N.J. 463, 472 (1999). Except as noted, the following facts derive from their testimony at the hearing.

At approximately 12:45 a.m., on April 20, 2016, Mosca arrived at the Northview Motel in Florence Township to investigate a report of a deceased dog named Leonidas. Upon her arrival, Mosca learned Leonidas' last known location was defendant's farm in Springfield, which Mosca previously visited in 2014 for an unrelated matter. Although Mosca acknowledged "there was no emergency," she and George Ondusko, an animal control officer, nevertheless left the motel to investigate defendant's residence, and arrived by 2:00 a.m.

When they arrived, Springfield Police Department's Sergeant O'Malley was knocking on the front door, as he had been for "awhile." Mosca used a flashlight to look through the front windows into a foyer before the officers walked around to the back of defendant's house. After knocking on the back door, someone noticed movement inside, so Mosca "yelled" that she wanted to speak with defendant.

According to Mosca, defendant came outside "off balance" and visibly intoxicated, but was coherent and capable of answering questions. Mosca also stated that defendant did not seem "uncomfortable or nervous," but, instead, seemed "relaxed" and capable of telling the officers to leave if he so desired.

A-1521-17T3

When asked whether he knew "what happened to the dog," defendant responded that Leonidas "got hit by a car out on Route 68," the road fronting his farm, but stated that he did not know "[w]hen and where" that happened. Mosca then asked defendant if he was "sure that that's really what happened," and informed him that they were "probably going to get a necropsy," which "would show the cause of death." Defendant maintained Leonidas "got hit by a car," then showed the officers where Leonidas "had been tied out previously and stated that the leash had broken and that must be how he got away."

As O'Malley proceeded to leave, Mosca asked defendant about a dog that he owned named Snoopy. Defendant invited Mosca and Ondusko into his home to check on Snoopy's dry skin. Aside from the dry skin and a callused paw, Mosca believed Snoopy was fine, so she and Ondusko left defendant's property shortly thereafter.[2]

---

[2] Ondusko testified that he saw blood and an axe in defendant's foyer through the front-door window, and that after entering the home, he more closely examined the foyer, the axe, and the blood. Neither defendant's statements at the encounter in the home, nor the search conducted before or after entering the home, or the State's justification for what occurred at those times were raised before the trial court or now in this appeal, and therefore need not be addressed by this court. See State v. Robinson, 200 N.J. 1, 20 (2009) (discussing the "requirement that matters be explored first and fully before a trial court"); State v. Herrera, 187 N.J. 493, 501 (2006) (discussing prerequisites for an issue to be properly before appellate courts); Laurino Co.

Later that day, Mosca learned that a man named P.F.[3] had information implicating defendant in Leonidas' death. Mosca arranged to meet P.F. and Cooper to gather more information. When P.F., who resided in a trailer on defendant's farm in April 2016, did not show up, Mosca called his girlfriend, who stated that P.F. spent the night at defendant's farm.

Cooper and Mosca arrived at defendant's farm at around 10:30 a.m., and were joined by two Springfield police officers, which Cooper claimed was consistent with normal SPCA practice. One of the police officers knocked on the door of P.F.'s trailer, which was "at least" fifteen or twenty feet away from defendant's house. P.F. answered and had a "very brief" conversation with Cooper outside that lasted "not even five minutes." During that conversation, defendant "came out from . . . behind the trailer where the house is," and, according to Cooper, "was just kind of making himself visible" by "coming . . . into [Cooper's] eye" or "into [her] view."

---

v. Daly Bldg. Corp., 21 N.J. Super. 556, 564 (App. Div. 1952) ("It is well settled that a matter not discussed upon the argument or in the brief need not be considered.").

[3] We use initials for P.F. to protect his privacy.

After she finished speaking with P.F., Cooper "walked up to [defendant] and identified [herself]." Cooper testified on direct examination:

Q. . . . About how long did you speak to [defendant]?

A. Maybe two or three minutes.

Q. Okay.

A. It wasn't long.

Q. What did you say?

A. Well, I identified myself. And I told him – I said that I was there about the puppy that had died. And I asked him what had happened, could he tell me what happened to the puppy. And he started to explain about how the puppy had gotten loose and it had run into the road. And I said to him, based on the information, we had a necropsy that was done on the puppy.

Q. Correct.[4]

A. I said the injuries aren't consistent with that. And I said to him, can you tell me what happened? And again he went into it. I said, [c]an you just tell me why the puppy upset you? Why don't you just tell me what happened. Just explain to me

_____

[4] The prosecutor and defense counsel submitted, and the court found, that a necropsy was not performed in this case. The court further found, however, that the officers "believed" a necropsy was performed when "they approached [defendant] at his residence," and that the officers used the word necropsy "interchangeably" with an x-ray and physical examination that were performed on Leonidas by a veterinarian, Dr. Sharon Johnson, who testified at trial.

A-1521-17T3

what upset you about the puppy. And at that point is where [defendant] said to me he was shitting and pissing all over the place, excuse my language, and he was going after my chickens. And I said okay. So what did you do? And he said, I took him out.

Q. And [those were] the words he used?

A. He used those exact words.

Q. Well, what was his demeanor like during this brief conversation that you had with him?

A. He was fine. It was almost -- you know, it was almost like he wanted to say it. It wasn't -- he just came out and said it.

Q. Did he seem at any time either prior to you speaking with him or during your conversation with him reluctant to talk to you?

A. No. No.

Q. After he said that he took the dog out . . . did you say anything in response or ask him any additional questions?

A. Yes. At that point I said, [h]ow?

Q. And what did he say?

A. And he said, [w]ith an axe. And I said can you show it to me? I think I did ask him how many times he may have hit the puppy. I think he said at that point twice. And I said well, can you show it to me? And he said, [i]t's in the shed.

7

Q. And did you go out to the shed?

A Yeah. Well, it was right there, yes. He directed us right to the shed and opened the door. Actually[,] I think he walked us over to the shed, opened the door and said, [t]here it is.

Mosca testified that she "actually watch[ed]" defendant "pick [the axe] up" and "hand it" to one of the Springfield police officers. Thereafter, Cooper issued defendant a summons with a mandatory court appearance, but he was not placed in handcuffs or formally arrested at that time.

On April 23, 2016, defendant was arrested and charged with third-degree possession of a weapon for an unlawful purpose and criminal mischief. Two weeks later, he was charged in an indictment with two third-degree offenses, one count of possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d), and one count of cruelty to animals resulting in death, N.J.S.A. 4:22-17(c)(1) and (d)(1)(a).

At the suppression hearing, defendant moved to suppress his statements, certain photographs, the State's proffered expert testimony, and the axe. The court suppressed his oral statements and some of the photographs, admitted other photographs, the State's expert testimony, and the axe.[5]

---

[5] On appeal, defendant challenges only the court's admission of the axe.

In suppressing defendant's oral statements, the court found that defendant was subjected to custodial interrogation during both encounters. Specifically, the court found that defendant was in custody during the first encounter because the officers "weren't going to stop . . . knocking and banging" on his doors at 2:00 a.m., while yelling his name to come out, so his "freedom to say no was somewhat taken away" from him. The court also found that "it just can't be denied that [the officers] had information they wanted to get from [defendant] that they thought was going to be incriminating and their questions were designed to elicit that type of a response."

With respect to the second encounter, the court found it was "not the middle of the night," the officers were there to speak with P.F. who "stood them up essentially," and they were "not banging on the door" or "refusing to leave until they get to talk to" defendant like the first time. The court further found, however, that the second encounter was "very close in time" to the first, indeed, "less than [twelve] hours" afterward, and created a "cumulative" effect. Noting that the officers communicated additional inculpatory information to defendant, including that results of a necropsy were not consistent with a car accident, the court found Cooper's questions were "clearly designed to elicit an incrimination response," and amounted to, "[d]id you kill this dog on purpose."

Therefore, the court concluded the second encounter was "a coercive situation and a custody situation," and defendant "simply couldn't have felt that he was not in custody or certainly being interrogated at that point in time."

Accordingly, the court determined that because both encounters were "custodial interrogation[s], factually in evaluation of the totality of the circumstances," Miranda warnings were required in both instances. "[B]ecause it is [a] prophylactic rule," the court held that "the only legitimate response . . . is to suppress [defendant's] statement[s] as a result."

However, the court concluded that under United States v. Patane, 542 U.S. 630 (2004), the prophylactic Miranda rule "wouldn't apply to the physical evidence," i.e., the axe, because defendant's "statements were voluntary." Further, the court determined "it would be the same analysis" under State v. Johnson, 118 N.J. 639 (1990) because, although defendant produced the axe "temporally . . . close in time" to when he made his statements, those "statements were voluntary," his production of the axe was not "the result of bad faith," and there was no "flagrant misconduct . . . based on the testimony of the officers[,] which [the court] found to be credible." Accordingly, the court held that under those circumstances, "in conjunction with the fact that [defendant] did voluntarily turn over the axe," the axe was admissible.

The court then addressed what defense counsel referred to as a "logistics" matter that would arise when the State introduced the axe at trial. Specifically, the court addressed whether the State would elicit testimony about defendant's act of "voluntarily hand[ing] [the axe] over" to the officers. Without ruling on the admissibility or legal implications of that act of production, the court determined that the matter was "something [counsel] c[ould] work out."

The same judge presided over the ensuing two-day trial, which commenced the day after the suppression hearing. Ondusko, Mosca, P.F., and the veterinarian who examined Leonidas, Dr. Johnson, testified as witnesses for the State. Defendant did not call any witnesses, and the State introduced the axe without reference to the fact that defendant produced it. At the close of the State's case, defendant moved for a judgment of acquittal. The court denied his motion with respect to both the weapon and animal-cruelty charges and the jury found defendant guilty of both counts of the indictment. Following a hearing, the court sentenced defendant to 300 days in jail and two years of probation for each of the convictions, the sentences to run concurrently.

On appeal, defendant argues:

11

POINT I

THE AXE MUST BE SUPPRESSED BECAUSE IT WAS PRODUCED IN RESPONSE TO UNWARNED CUSTODIAL INTERROGATION.

POINT II

THE JURY SHOULD NOT HAVE BEEN PERMITTED TO CONSIDER WHETHER DEFENDANT WAS GUILTY OF THIRD-DEGREE ANIMAL CRUELTY BECAUSE THE STATE FAILED TO PRESENT EVIDENCE SUFFICIENT TO WARRANT A CONVICTION FOR THAT OFFENSE.

POINT III

DEFENDANT'S ANIMAL CRUELTY CONVICTION MUST BE REVERSED BECAUSE THE TRIAL JUDGE FAILED TO DEFINE A NUMBER OF CRITICALLY IMPORTANT TERMS IN THE JURY INSTRUCTION.

Because we agree with defendant's first point, and reject the State's claim that any error in admitting the axe was harmless, we vacate defendant's conviction and sentence without reaching defendant's remaining arguments.

II.

Appellate review of a suppression ruling that implicates the right against self-incrimination requires us to "engage in a 'searching and critical' review of the record to ensure protection of a defendant's constitutional rights." State v. Hreha, 217 N.J. 368, 381-82 (2014) (quoting State v. Pickles, 46 N.J. 542, 577 (1966)). That standard "does not generally involve 'an independent assessment

of the evidence as if [the reviewing court] were the court of first instance.'" Id. at 392 (alteration in original) (quoting Locurto, 157 N.J. at 471). Instead, we defer to the court's factual and credibility findings when supported by sufficient evidence in the record. Locurto, 157 N.J. at 472. We review legal conclusions de novo. Hreha, 217 N.J. at 382.

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." State v. Nyhammer, 197 N.J. 383, 399 (2009). That right is "jeopardized" when an individual is subjected to custodial interrogation by law enforcement officers. Miranda, 384 U.S. at 478. Therefore, before "evidence obtained as a result of interrogation can be used against" the individual at trial, the prosecution must show that Miranda warnings were administered and that the individual "knowingly and intelligently" waived his or her Miranda rights. Id. at 479; see also State v. O'Neill, 193 N.J. 148, 185 (2007) ("Miranda rights safeguard New Jersey's privilege against self-incrimination."); State v. Shaw, ___ N.J. ___, ___ (2019) (slip op. at 44) (suppressing evidence obtained in a vehicle and stating "[w]hether viewed through the lens of [a third party's] non-voluntary consent or [defendant's] coerced confession, the evidence

13

obtained from the vehicle is subject to exclusion as fruit of the poisonous tree").

A "law enforcement officer" has placed a person in "custody" when, objectively, "there has been a significant deprivation of the suspect's freedom of action" under the circumstances. See State v. P.Z., 152 N.J. 86, 103-04 (1997). "[I]nterrogation" means "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (footnotes omitted).

The trial court found, and the State does not dispute on appeal, that defendant was subjected to custodial interrogation by law enforcement officers during both encounters on his property. Accordingly, the trial court held that defendant's statements were inadmissible, see Miranda, 384 U.S. at 478-79; State v. Hubbard, 222 N.J. 249, 265 (2015), and the State does not dispute the propriety of that determination on appeal.

Instead, the parties' dispute centers exclusively on the court's decision not to suppress the axe as well. According to defendant, because the court "properly suppressed" his "statement about the location of the axe," there is "no reason why the result should not be the same" with respect to "the axe that

14

was produced as a direct result of [Cooper's] questioning." The State maintains the court "properly did not suppress . . . the axe" because "[w]hen the physical evidence is not the by-product of a coerced statement, then there is no need to extend <u>Miranda</u>'s protections." Thus, the narrow issue before us is the scope of the remedy afforded an individual whose response to unwarned custodial interrogation is the production of physical evidence.

As noted, the trial court did not directly rule upon the admissibility or legal implications of defendant's act of producing the axe to the officers. Instead, after the court suppressed defendant's verbal statements, while holding the axe was admissible, defense counsel requested as a "logistics" matter that the State "limit the testimony of the axe to not be that [defendant] is just handing it over to law enforcement." The court ultimately determined that the issue was "something [counsel] c[ould] work out."

As we explained in <u>State v. Mason</u>, 164 N.J. Super. 1 (App. Div. 1979), "[n]on-verbal responses to questioning are treated in the same way as are verbal responses." <u>Id.</u> at 4. That is because "[t]he privilege against self[-]incrimination extends to all acts intended to be of a testimonial or communicative character, whether in verbal or other form." <u>Ibid.</u>; <u>accord</u> N.J.R.E. 801(a)(2) (defining "statement" to include "nonverbal conduct of a

15

person if the person intends it as an assertion"). In <u>Mason</u>, police officers led the defendant into a patrol vehicle and asked her whether she had any drugs, without administering <u>Miranda</u> warnings. 164 N.J. Super. at 3. Defendant "first replied, 'I don't know,' but then produced from between her sweater and blouse a plastic bag containing cocaine and an opium derivative." <u>Id.</u> at 3-4.

Finding sufficient support for the trial court's determination that defendant was subjected to unwarned custodial interrogation, we upheld the court's determination to suppress the evidence obtained, reasoning that "[h]ad defendant made an oral admission of the fact that she possessed narcotics it would not have been admissible against her because she had not been warned of her right to remain silent." <u>Id.</u> at 4. Thus, "[w]e perceive[d] no reason why the result should not be the same when her response was of a different nature" because "[t]he privilege against self-incrimination extend[ed]" to her act of production. <u>Ibid.</u>; <u>accord</u> <u>State v. Hall</u>, 253 N.J. Super. 84, 91-92 (Law Div. 1990) (suppressing physical evidence, not under "the fruit of the poisonous tree" doctrine, but "because the defendant produced the [physical evidence] in direct response to the detective's question whether he 'had anything on him'"), <u>aff'd</u>, 253 N.J. Super. 32 (App. Div. 1991); <u>State v. Preston</u>, 411 A.2d 402, 408

(Me. 1980) (suppressing physical evidence defendant "deliver[ed]" to police as "part of his self-inculpatory response" to unwarned custodial interrogation).

In this case, it cannot seriously be disputed that defendant's act of handing the axe to a police officer was communicative ("here is the axe I used to kill Leonidas"). Accordingly, that act of production and the evidence produced should have been suppressed under Mason. Further, the trial court's reliance on Patane was misplaced.

In Patane, the defendant, a convicted felon, was arrested for violating a restraining order. 542 U.S. at 635. A detective began administering Miranda warnings, but stopped when defendant stated he knew his rights, and did not complete the warnings thereafter. Ibid. Instead, the detective proceeded to interrogate defendant about a pistol that the detective had reason to believe defendant unlawfully possessed. Id. at 634-35. Defendant expressed reluctance to discuss the gun because he did not want the detective to take it, but after the detective persisted, defendant confessed that it was in his bedroom. Id. at 635. With defendant's permission to enter his bedroom, the detective "found the pistol and seized it." Ibid.

The plurality opinion written by Justice Thomas, in which Chief Justice Rehnquist and Justice Scalia joined, held that although "the physical fruit of

17

actually coerced statements" must be excluded from evidence at trial, "[t]he Self-Incrimination Clause . . . is not implicated by the admission into evidence of the physical fruit of a voluntary statement." Patane, 542 U.S. at 636, 644. The concurring opinion written by Justice Kennedy, in which Justice O'Connor joined, similarly concluded that "[a]dmission of nontestimonial physical fruits" of an unwarned statement "does not run the risk of admitting into trial an accused's coerced incriminating statements against himself." Id. at 645.

The common denominator of these opinions is that, although otherwise-voluntary statements made in response to custodial interrogation are deemed presumptively compelled, physical evidence seized as a result of those statements is admissible against the defendant at trial. See State v. Michaels, 219 N.J. 1, 29 (2014) ("The general rule for interpreting" decisions in which fewer than five Justices joined in a single majority opinion, e.g., Patane, "is that 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" (quoting Marks v. United States, 430 U.S. 188, 193 (1977))).

The key distinction between this case and Patane is the defendant in Patane did not physically hand the weapon to the officers as defendant did here. Thus, the plurality's principal conclusion that there is "no reason to

18

apply the 'fruit of the poisonous tree' doctrine" to "mere failures to warn," <u>see</u> <u>Patane</u>, 542 U.S. at 642, is inapposite because the axe was obtained in direct response to custodial interrogation. <u>See</u> <u>Johnson</u>, 118 N.J. at 652 (1990) ("Indirectly-obtained evidence is excluded as 'the fruit of the poisonous tree.'" (quoting <u>Wong Sun v. United States</u>, 371 U.S. 471, 487-88 (1963))); <u>Hall</u>, 253 N.J. Super. at 92 (recognizing "the fruit of the poisonous tree" doctrine is inapplicable when physical evidence is produced "in direct response" to questioning).

Although we are uncertain if this this distinction would have changed the opinion of any of the five Justices in the majority, "[t]he shifting sands of federal jurisprudence provide no certainty concerning the standard that might apply to the next set of slightly different facts." <u>See</u> <u>O'Neill</u>, 193 N.J. at 175. The slightly different fact between this case and <u>Patane</u> is the dispositive act of production. Therefore, the admissibility of the axe was governed by <u>Mason</u>, not <u>Patane</u>.

In addition, we disagree with the trial court's conclusion that the axe was admissible under <u>Johnson</u>. In <u>Johnson</u>, the Court set forth the three-factor test for determining whether to admit evidence obtained as a result of a violation of a defendant's right against self-incrimination: "(1) the temporal proximity

19

between the illegal conduct and the challenged evidence; (2) the presence of intervening circumstances; and (3) the flagrancy and purpose of the police misconduct." Johnson, 118 N.J. at 653.

The trial court found that the proximity between "[t]he police violat[ing] their prophylactic responsibilities" by failing to administer Miranda warnings and defendant producing the axe was "temporally . . . close in time . . . ." But, without addressing the second prong, the court concluded that "this isn't the result of bad faith" because defendant's "statements were voluntary" and there was no "flagrant misconduct . . . based on the testimony of the officers[,] which [the court] found to be credible."

To the extent the Johnson analysis applies to acts of production, the first and second Johnson prongs weigh against admission of the evidence. There were no intervening circumstances between the unwarned custodial interrogation and defendant's production of the axe, and the two events were simultaneous as defendant's production of the axe was part of his response to the interrogation. Further, although we defer to the trial court's factual findings underpinning its third-prong determination, the court also found "it would be unlikely that a law enforcement officer," i.e., one of the Springfield

police officers during the second encounter, "just wouldn't know right away to say . . . wait, I'm going to give you these <u>Miranda</u> warnings."

We agree it is unlikely that the officers did not know <u>Miranda</u> warnings were necessary, and conclude the appropriate remedy to prevent future failures to administer <u>Miranda</u> warnings prior to commencing custodial interrogation is to suppress physical evidence produced in direct response to that questioning. <u>See</u> <u>Mason</u>, 164 N.J. Super. at 3-4; <u>see</u> <u>generally</u>, <u>State v. Gravel</u>, 601 A.2d 678, 685 (N.H. 1991) ("To allow the police the freedom to disregard the requirements of <u>Miranda</u>" when physical evidence is sought "would not only not deter future <u>Miranda</u> violations but might well tend to encourage them.").

Finally, we reject the State's argument that any error in admitting the axe was harmless. To the extent it was not "structural error" requiring "automatic reversal," <u>see</u> <u>State v. Camacho</u>, 218 N.J. 533, 549 (2014) (quoting <u>Neder v. United States</u>, 527 U.S. 1, 7 (1999)), we conclude admission of the axe, which the State's attorney referred to seven times in his opening statement and fifteen times in his closing remarks, was "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." <u>See</u> <u>State v. Bankston</u>, 63 N.J. 263, 273 (1973).

21

In light of our decision, we do not reach defendant's remaining arguments regarding the sufficiency of the evidence or the court's jury instructions.

The order denying suppression is reversed, defendant's judgment of conviction and sentence are vacated, and the matter is remanded for a new trial at which the axe will not be admitted.

Reversed in part, vacated in part, and remanded for further proceedings consistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1521-17T3