**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5289-17

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RHUMEIR D. MONEY,
a/k/a RHUMER MONEY,
and RHUMEIR MONEY,

     Defendant-Appellant.

_____

Argued May 25, 2021 – Decided July 21, 2021

Before Judges Fisher, Gilson and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 14-03-0691.

Timothy E. Burke, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Timothy E. Burke, on the brief; Tina DiFranco, on the briefs).

Linda A. Shashoua, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Jill S. Mayer, Acting Camden County

Prosecutor, attorney; Linda A. Shashoua, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

After a twelve-day jury trial, defendant Rhumeir D. Money was convicted of all indicted counts: first-degree murder of Brian Burnett, N.J.S.A. 2C:11-3(a)(1), (2) (count one); first-degree attempted murder of Jeroboam Fisher, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3(a)(1), (2) (count two); first-degree attempted murder of Carlos Perry, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3(a)(1), (2) (count three); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count five); and first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3(a)(1), (2) (count six). He appeals from the judgment of conviction arguing:

POINT I

[DEFENDANT'S] [JUNE 20, 2013] STATEMENT MUST BE SUPPRESSED BECAUSE THE DETECTIVES FAILED TO SCRUPULOUSLY HONOR HIS RIGHT TO REMAIN SILENT.

    A.   [Defendant] Invoked His Federal Constitutional and State Common-Law and Statutory Rights to Remain Silent by

2

Telling the Detective[s] Who Were Questioning Him, "[I'm] Not Saying Nothing."

B.  [Defendant's] June 20, 2013 Statement Must Be Suppressed Because the Detectives Failed to Scrupulously Honor His Invocation of the Right to Remain Silent.

C.  Assuming Arguendo, that [t]his Court Holds [t]hat [Defendant] Did Not Invoke His Right [t]o Remain Silent, [Defendant's] June 20, 2013 Statement Must Be Suppressed Because He Did Not Waive His Miranda[1] Rights Knowingly, Intelligently[] [o]r Voluntarily.

POINT II

[DEFENDANT'S] JUNE 21, 2013 STATEMENT SHOULD HAVE BEEN SUPPRESSED AS THE "FRUIT OF THE POISONOUS TREE[."]

POINT III

THE TRIAL COURT COMMITTED PLAIN ERROR BY PERMITTING THE INTRODUCTION OF INADMISSIBLE HEARSAY STATEMENTS REGARDING THE IDENTITY OF THE SHOOTER IN THE STATEMENT AND TESTIMONY OF JEROBOAM FISHER.

POINT IV

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

3

A-5289-17

DETECTIVE KING'S TESTIMONY NARRATING THE SURVEILLANCE VIDEO WITH HIS OWN OPINIONS AS TO WHAT THE VIDEO DEPICTED INVADED THE PROVINCE OF THE JURY AND USURPED THE JURY'S FACTFINDING ROLE IN VIOLATION OF [N.J.R.E.] 701 AND [DEFENDANT'S] RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

Defendant adds the following points in his pro se brief:

POINT I

[DEFENDANT'S] WAIVER OF MIRANDA RIGHTS WAS NOT KNOWING OR VOLUNTARY AND HIS STATEMENT SHOULD BE SUPPRESSED FOR ALL PURPOSES PURSUANT TO MIRANDA V. ARIZONA.

POINT II

DEFENDANT WAS DEPRIVED OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS OF A FAIR TRIAL AND DUE PROCESS FOR THAT THE IDENTIFICATION OF DEFENDANT . . . AS THE SHOOTER BY SHOOTING VICTIM JEROBOAM FISHER WAS HIGHLY SUGGESTIVE AND AT BEST TAINTED.  THE IDENTIFICATION BY JEROBOAM FISHER TO DETECTIVES DONL[O]N AND FISHER SHOULD HAVE BEEN SUPPRESSED FOR THAT THERE IS A STRONG INDICATION OF SUGGESTIVENESS.

We previously granted the State's motion to settle the record, R. 2:5-5(a), because of a discrepancy in the transcript of defendant's video-recorded first statement to detectives from the Camden County Prosecutor's Office (CCPO)

4

A-5289-17

and Camden Metro Police on June 20, 2013, and remanded for the trial court to accomplish that settlement. The trial court, without a hearing, "listened to and viewed the corresponding portion of [the] video and audio recording of . . . [d]efendant's statement"—during which defendant alleges he invoked his right to remain silent—and entered an order setting forth its determination of what defendant said in that contested portion of the interview. The court, however, did not set forth its findings of fact that led to that determination, as required by Rule 1:7-4(a), compelling us to, again, remand this matter.

The evening the three victims were shot, one fatally, CCPO Detective Terry King obtained a description of one of the shooters from eyewitness J.V.,[2] who also described the vehicle used in the shooting as a dark-colored Jeep. Another detective retrieved surveillance video showing a dark-colored Jeep leaving the area of the shootings. About six hours after the shootings, police canvassing the area discovered a Jeep similar to the one described and seen on the video footage. King learned defendant owned the Jeep and had reported it stolen on the day police discovered it.

---

[2] We use initials to protect the witness's identity.

Four days later, King informed defendant "a concern had surfaced with his vehicle" and that he needed to speak with him at the CCPO. King drove defendant to the CCPO because defendant lacked transportation.

King administered <u>Miranda</u> warnings to defendant at the CCPO before he and Camden Metro Police detective Shawn Donlon took defendant's first statement during which defendant eventually admitted shooting at the three victims after one had shot at him. He was arrested. The next day, defendant was transported back to the prosecutor's office at his request and gave a second statement. The majority of the second statement was not recorded due to a "technical difficulty" that caused the recording device to stop while King was Mirandizing defendant. Both statements were introduced at trial after the trial court denied defendant's bid to suppress them.

In his suppression argument to the trial court, defendant averred he did not validly waive his <u>Miranda</u> rights and that the statements were not voluntarily given. For the first time, on appeal, he argues his first statement should have been suppressed because he had invoked his right to remain silent.

The pertinent portion of the first statement was the subject of our prior remand order. Defendant had repeatedly denied he was in the Jeep. He maintained he was at his girlfriend's house at the time of the shooting, an alibi

6

he maintained at trial through his girlfriend's testimony. Leading up to that pertinent portion, the detectives continued their attempt to have defendant tell them about the shooting:

> [KING]: We're trying to give you an opportunity to tell us what happened, and what your role was. Okay? Because that does in fact make a difference. That makes a difference whether you know, you shot ten times, all that, that makes a difference. That's what we're—here's an opportunity for you to say, look, this is what happened. My man was in the—shot in the back—bang it all, I banged all, it's my bang up, whatever, it's my bang oh, I don't know. I wasn't out there in that regard. But I do know what took place. And you were in that car. You were in your truck. Here's your opportunity, man.
>
> [DONLON]: Rhumeir, were you defending yourself? Is—is—tell us what happened?
>
> [KING]: Did somebody shoot at you first? Did somebody disrespect—what?
>
> [DONLON]: Tell us what happened.
>
> [KING]: Did they—did somebody provoke you? We know about this war that's going on. We know what side you're on. We know who your peoples are. And we know who their peoples are. Was there something you're trying—did they come at you? I don't know. Did they see you on the block—you said—what was it over, man? What happened? That's what we want to know, what was it over?

According to the certified transcript of the suppression motion hearing, defendant responded: "I ain't saying nothing. —my shit. There ain't no way that the system gonna justify nothing. So it don't even matter —[.]" A listening aid prepared by the State—and provided to the court during the suppression hearing and to the jury during trial, but not entered into evidence—reports defendant's response as: "It was nothing. Just going my shit. And nobody ain't nobody got the system going justify nothing so it don't even matter." The trial court, pursuant to our remand order, "listened to and viewed the corresponding portion of that video and audio recording of . . . [d]efendant's statement," and determined defendant said: "[indiscernible] not saying nothing. Just doing my shit."

Defendant argues he invoked his right to remain silent which the detectives ignored when they continued to question defendant and ultimately obtained his admission during the first statement that he participated in the shootings as "pay[]back" because Perry had killed one of defendant's "boys"; defendant also told the detectives Perry "shot at me, so I shot back."

The State counters the listening-aid version went unchallenged at the trial level; defendant waived his claim that he asserted his right to remain silent by failing to raise that issue to the trial court; the certified version was "a fluke of

transcription"; defendant's "undeniably mumbled and garbled remark was, at best, unintelligible and far short of the objectively unequivocal invocation that officers must scrupulously honor"; and "the full context of the record clearly supports that defendant never, even ambiguously, invoked his right to remain silent."

Defendant's averred invocation of his right to remain silent is "separate and apart" from the issue raised to and considered by the trial court: defendant's knowing, intelligent and voluntary waiver of his Miranda rights. State v. Hartley, 103 N.J. 252, 260-61 (1986). We typically consider arguments raised for the first time on appeal under the plain error standard, see R. 2:10-2, under which "[a]ny error or omission shall be disregarded by [this court] unless it is of such a nature as to have been clearly capable of producing an unjust result," ibid. In a jury trial, the possibility of such an unjust result must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971).

If defendant invoked his right to remain silent, the admission of one or both statements at trial may have led to the possibility of an unjust result. That right "is guaranteed by the Fifth Amendment to the United States Constitution" and further protected under New Jersey's "common law, now embodied in

statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." State v. S.S., 229 N.J. 360, 381-82 (2017) (citation omitted). "The requirement that an asserted right be scrupulously honored has been carefully guarded in this state in order to ensure that full opportunity to exercise the privilege is permitted." Hartley, 103 N.J. at 261. "[I]f after a suspect avails himself of the Constitution's protections the police violate a right that has been invoked, that violation, by definition, is of constitutional magnitude." Id. at 273. Any statement taken after a suspect invokes his right "cannot be other than the product of compulsion, subtle or otherwise." Ibid. (quoting Miranda, 384 U.S. at 474).

During an interrogation, if a person makes "a request, 'however ambiguous,' to terminate questioning or to have counsel present[,] [it] must be diligently honored." Id. at 263 (quoting State v. Kennedy, 97 N.J. 278, 288 (1984)). "Any words or conduct that reasonably appear to be inconsistent with defendant's willingness to discuss his case . . . are tantamount to an invocation of the privilege against self-incrimination." State v. Bey (Bey II), 112 N.J. 123, 136 (1988). If the police are unsure if a suspect invoked the right, they must either "(1) terminate the interrogation or (2) ask only those questions necessary to clarify whether the defendant intended to invoke his [or her] right to silence." S.S., 229 N.J. at 383.

10

Thus, a determination of the exact words used by defendant and an analysis of those words in context is crucial to determining if the admission of the statements engendered an unjust result. As we tell jurors: "The specific words used and the ability to remember them are important to the correct understanding of any oral communication because the presence, or absence, or change of a single word may substantially change the true meaning of even the shortest sentence." Model Jury Charges (Criminal), "Statements of Defendant" (rev. June 14, 2010).

It appears both parties submitted evidence to the trial court after our remand. In his merits brief, defendant related that the State submitted to the trial court "a letter brief and a boxful of materials to consider when settling the record." After defendant objected and requested an opportunity to respond, he contends the trial court's law clerk "responded that the [court] would advise the parties how to proceed." Defendant thereafter

> submitted a letter brief to the trial [court], reiterating his request to be heard and asking the [c]ourt to delay making a decision until he could move to supplement . . . the record. [T]he [l]aw [c]lerk again advised the parties that [the trial court] would instruct them on how to proceed on the merits.
>
> The parties never received any further direction from the [c]ourt.

11

Defendant further asserts he submitted a letter brief and certifications from the transcriber and her supervisor attesting to the accuracy of the transcript, to which the State filed a response brief.

As we have noted, the trial court did not afford the parties an opportunity to argue why one version of defendant's statement was more accurate than another. And the trial court did not, as it had done throughout the course of this case, make findings of fact or conclusions of law. See R. 1:7-4(a). We do not know which, if any, of the parties' submissions it considered, or if it considered the testimony of King or Sergeant Patricia Taulane, whom the State avers testified as to the accuracy of the listening aid. Understanding the transcriber was listening to a recording of a recording played in court, and both parties' merits briefs point out transcription errors,[3] we do not know why the trial court rejected the version defendant contends is correct. Understanding the listening aid was unilaterally prepared by the State, and tacitly or expressly approved for

---

[3] Defendant submits his "statement, 'Then I didn't do nothing[,]' does not appear in the Miranda hearing transcript. However, [defendant] can be heard saying it on the DVD at a [specified] time-stamp. . . ." The State contends the transcript deviates from the listening aid in sections other than that where defendant contends he invoked his right to remain silent, highlighting the omission of defendant's statement: "I'm still getting locked up," and the mis-recording of his statement: "I did that shit off my—I was—got shot at so."

use during the trial,[4] we do not know why the court rejected the version the State contends is correct.

Under the circumstances, we vacate the trial court's order settling the record and remand the matter for oral argument on the settlement of the record followed by a supplemental suppression hearing. The present record is insufficient to allow us to decide this critical issue. We categorically reject the State's argument that "[t]he very fact that the phrase has been the subject of so much armchair debate further diminishes any sense that it was an invocation." Our remand under Rule 2:5-5(a) was meant to settle a crucial aspect of the record involving constitutional rights; it was not an "armchair debate."

Once the court determines the exact words uttered by defendant to the detectives, it must determine whether defendant, by words or conduct, invoked his right to remain silent. See S.S., 229 N.J. at 382. In determining that issue,

---

[4] Neither party has directed us to any portion of the record showing the court conducted a hearing to determine the accuracy of the listening aid, although the State specified in its merits brief portions of King's testimony in which he stated he reviewed the listening aid "in conjunction with" the recorded statement and acknowledged the listening aid was "basically accurate." The State also averred "Sergeant Taulane testified that the listening aid was accurate," but did not cite to any portion of the record to support that claim. It is incumbent on the party to support the facts material to the issues with references to the record; it is not the court's duty to search the record to substantiate a party's contention. See R. 2:6-2(a)(5).

the court must analyze "the totality of the circumstances, including consideration of the suspect's words and conduct. The . . . statement [must be] evaluated in the full context in which [it was] made." State v. Maltese, 222 N.J. 525, 545 (2015).

Our Supreme Court has determined that words like those defendant alleges he used are sufficient to invoke the privilege against self-incrimination. See id. at 386 (holding suspect invoked right to silence when he stated, "No, that's all I got to say. That's it"); State v. Johnson, 120 N.J. 263, 281 (1990) ("[A] suspect who has 'nothing else to say' . . . has asserted the right to remain silent . . . ." (citations omitted)); State v. Bey (Bey I), 112 N.J. 45, 64 (1988) (holding privilege invoked where suspect told police "he would have nothing to say"). But, as said, the context and defendant's conduct must also be considered.

The State claims defendant's "undeniably mumbled and garbled remark was, at best, unintelligible and far short of the objectively unequivocal invocation that officers must scrupulously honor." While we leave what defendant said to the remand proceedings, that claim ignores the proper analysis.

It is axiomatic that "a request to terminate an interrogation must be honored 'however ambiguous.'" Bey I, 112 N.J. at 64-65 (listing a number of cases standing for that principle). "The suspect is not required to express a

14

desire to terminate interrogation with the 'utmost of legal precision.'" Johnson, 120 N.J. at 281 (quoting Bey I, 112 N.J. at 65). Suspects "will often speak in plain language using simple words, not in the parlance of a constitutional scholar," and so as long as an officer "can reasonably understand the meaning of a suspect's words, the suspect's request must be honored." S.S., 229 N.J. at 383. "[A]n equivocal indication of a desire to remain silent, like an unequivocal indication, suffices to invoke Miranda's requirement that the interrogation cease." Johnson, 120 N.J. at 281 (alteration in original) (quoting Christopher v. Florida, 824 F.2d 836, 841 (11th Cir. 1987)). The Johnson Court harkened to its prior decision describing

> the standard for police conduct when faced with ambiguous assertions of Miranda rights:
>
> [W]here a suspect makes a statement which arguably amounts to an assertion of his Miranda rights and the interrogating agent recognizes that the statement is susceptible of that construction, his questioning with regard to the crime he is investigating should immediately cease and he should then inquire of the suspect as to the correct interpretation of the statement. Only if the suspect makes clear that he is not invoking his Miranda rights should substantive questioning be resumed.

> [Id. at 283 (alteration in original) (quoting State v. Wright, 97 N.J. 113, 120 n.4 (1984)) (citation omitted).]

If there was a question as to what defendant said, it was incumbent upon the detectives to ascertain what it was, especially if defendant said the phrase, "ain't saying nothing," as set forth in the official transcript and the judge's remand determination; we, of course, leave the determination of what defendant said to the trial court after it conducts the record-settlement hearing. Suffice it to say, an unintelligible record does not mean defendant was unintelligible in real time.

After determining whether defendant invoked his right to remain silent, the trial court on remand must also determine if any of defendant's first statement made prior to or after defendant allegedly invoked his right to remain silent, and any of defendant's second statement, is admissible. If a defendant invokes his right to remain silent, but the police continue to question him without interruption as if nothing had happened, the Court has made clear that "the right is not scrupulously honored." S.S., 229 N.J. at 384 (quoting Johnson, 120 N.J. at 282). "The failure of the interrogating detectives to have scrupulously honored defendant's right to remain silent makes inescapable the conclusion that

16

defendant's subsequent oral confession had been unconstitutionally compelled." Johnson, 120 N.J. at 284.

A statement's admissibility "obtained after the person in custody has decided to remain silent depends under Miranda on whether his right to cut off questioning was scrupulously honored." Maltese, 222 N.J. at 547 (quoting Michigan v. Mosley, 423 U.S. 96, 104 (1975)). Factors to consider when determining whether the right has been scrupulously honored include: (1) how much time passed after the defendant first asserted his right to remain silent; (2) whether the defendant received new Miranda warnings before the police resumed interrogation; and (3) whether a different police officer questioned the defendant. See ibid. In Hartley, the Court announced a "'bright-line,' inflexible, minimum requirement" police must follow before resuming a custodial interrogation after a suspect invokes his right to remain silent: fresh Miranda warnings must be administered or the defendant's statement "cannot be admitted into evidence as part of the prosecution's case-in-chief." 103 N.J. at 267.

The trial court's determination of defendant's exact words may impact the court's prior determination that defendant knowingly, intelligently and voluntarily waived his Miranda rights. We neither state nor imply that the trial court's comprehensive oral opinion on the motion to suppress was erroneous.

Although a determination that defendant invoked his right to remain silent may render moot some issues to be analyzed, the admissibility of any statement made prior to any invocation still has to be determined, and defendant's exact words may impact the analysis of defendant's waiver with regard to that—or any—portion of his statement. See id. at 260 ("[T]he question of waiver is an inquiry separate and apart from the . . . question [of] . . . whether the defendant's right to remain silent has been properly respected in the first instance."). The words used by defendant may or may not indicate his understanding of the rights previously administered by King. The court should thus revisit that determination after the record is settled.

The trial court must also determine on remand if the second statement is inadmissible. Courts exclude "a second confession as the 'fruit of the poisonous tree' when law-enforcement authorities obtained an initial confession in violation of the defendant's common-law privilege against self-incrimination." State v. Johnson, 118 N.J. 639, 652 (1990). If police violated defendant's right against self-incrimination—rendering the first statement "unconstitutionally compelled and, under state law, illegally obtained and hence inadmissible[—]any 'separately-obtained' second statement must be approached with an eye to determining whether it was the product of a constitutional violation, sometimes

known as the 'fruit of the poisonous tree' doctrine." Hartley, 103 N.J. at 281-82. A key concern is whether defendant made the statement because he felt "the cat [was] already out of the bag" as a result of the first statement. Id. at 282.

Under the "fruit of the poisonous tree" doctrine, the admissibility of a second incriminating statement depends on whether the State established that the later statement was "not the product of the first" statement "or that the 'taint' of the first statement was attenuated." Id. at 283. Put another way, "the critical determination is whether the authorities have obtained the evidence by means that are sufficiently independent to dissipate the taint of their illegal conduct." Johnson, 118 N.J. at 653.

When determining whether a second confession is tainted by the first confession, courts consider the following factors: "the time between confessions, any intervening circumstances, whether there was a change in place, whether [the] defendant received an adequate warning of his rights, whether the defendant initiated the second confession, the effect of his having previously made a confession, and the 'purpose and flagrancy of police misconduct.'" Maltese, 222 N.J. at 548 (quoting Hartley, 103 N.J. at 283). "Ultimately, the determination whether the evidence is the 'fruit' of the illegal conduct is a factual matter for the court." Johnson, 118 N.J. at 653; see also

Hartley, 103 at 283-84 ("[The factors to be considered] are ordinarily viewed as questions of fact, to be determined by a trial court after a hearing. And ordinarily a remand for the purpose of conducting such a hearing and making findings of fact and conclusions of law would be in order.").

The record is sufficient for us to address the balance of defendant's claims, to which there is no merit.[5]

For the first time on appeal, defendant contends Fisher's trial testimony and his hospital-bed, recorded statement to King[6] three days after the shooting, which was played by the State at trial, contained impermissible hearsay that the trial court should have excluded or cured with instructions. Even a cursory review of the record scotches defendant's argument.

---

[5] We review defendant's arguments involving trial testimony to which no objection was made for plain error, but in so doing, we do not apprise the weight of the evidence against defendant because that evidence—particularly defendant's statements—is not settled. See State v. Singh, 245 N.J. 1, 13-14 (2021) ("To determine whether an alleged error rises to the level of plain error, it 'must be evaluated "in light of the overall strength of the State's case."'" (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018) (citation omitted))); see also State v. W.B., 205 N.J. 588, 614 (2011) (A guilty verdict following "a fair trial, based on strong evidence proving guilt beyond a reasonable doubt, should not be reversed because of a technical or evidentiary error that cannot have truly prejudiced the defendant or affected the end result.").

[6] Donlon was also present.

When the assistant prosecutor asked Fisher on direct examination "who was doing the shooting," Fisher began to cry and responded: "I can't do this, man." When the question was repeated, Fisher said he had a child on the way and couldn't "go through this right now, man." When the court directed Fisher to answer the question, he said: "I don't know. I didn't look him in his eye."

The assistant prosecutor continued direct examination by asking Fisher if he told King in the hospital-bed statement who shot him. The following colloquy ensued:

> [FISHER]: I mean, at the end of the day, I did tell him a name, but—
>
> [PROSECUTOR]: What was the name that you told him?
>
> [FISHER]: The name I told him, I'm just going off of what somebody said. I didn't see the person.
>
> [PROSECUTOR]: What was the name that you told Detective [King] ?
>
> [FISHER]: What was the name I said?
>
> [PROSECUTOR]: That's the question, sir.
>
> [FISHER]: I said somebody named Reck.[7]

---

[7] "Reck" or "Wreck" was a name by which Fisher said he knew defendant.

The assistant prosecutor then showed Fisher the photograph of defendant that had been used during an identification procedure, leading to this discourse:

[FISHER]: That's the person I said. That's my name, right? That's what you asked me.

[PROSECUTOR]: Is that your signature on the bottom of that piece of paper?

[FISHER]: I'm not sure if that's my signature.

[PROSECUTOR]: Well, it's a signature and it's your name, is that correct?

[FISHER]: Correct.

[PROSECUTOR]: And did you write your name on that picture?

[FISHER]: Yes I did.

[PROSECUTOR]: On June 18th of 2013, there's a date there as well?

[FISHER]: Yes.

[PROSECUTOR]: And what does it say at the top of that photograph?

[FISHER]: The name that I told you, when you just asked me.

[PROSECUTOR]: Does it say Reck?

[FISHER]: Yeah.

22

[PROSECUTOR]: And you signed that—did you sign that photograph because that is the man that you know as Reck?

[FISHER]: I signed the paper.

[PROSECUTOR]: Did you sign that—the paper indicating that that is who you know as Reck?

[FISHER]: I personally don't know him, so I can't say I know him.

[PROSECUTOR]: That you recognize—

[FISHER]: This is what I . . . was just seeing. This is what I was told, so yes that's him.

[PROSECUTOR]: Is this the person that you recognize as Reck? Not that you know him personally. I'm not asking if you know him personally.

[FISHER]: I'm telling you just the name, this is the name that I got, this is the name that I told [King]. This is my signature, and this is the date I put.

[PROSECUTOR]: And are you signing that saying that is the name that you know as Reck?

[FISHER]: I can't—

[PROSECUTOR]: Wasn't that your reason for signing and dating that picture?

[FISHER]: No. This was—like I said, it came to me already.

[PROSECUTOR]: That's not what I'm asking you, sir.

23

A-5289-17

[FISHER]: I'm telling you. I'm trying to give you my answer. This is—when they came to me already, I just signed my name here.

[PROSECUTOR]: But you gave the name Reck to Detective [King]?

[FISHER]: Yeah. I said that's what I heard, yeah. That's what I gave him. All he did was Reck.

[PROSECUTOR]: And did Detective [King] then show you the photograph?

[FISHER]: Already, yeah, from Reck before he started asking me questions he had this photo up. Yes.

[PROSECUTOR]: And did he ask you is this the man that you know as Reck? Is this who you know as Reck, the person in this picture?

[FISHER]: I told him that I don't know. That's why I told him check these names out.

When Fisher's direct examination resumed two weeks later, the assistant prosecutor again questioned defendant about the statement he gave to King:

[PROSECUTOR]: During your statement to Detective [King], did you tell him—

[FISHER]: Yes.

[PROSECUTOR]: —what you did on June 15th—

[FISHER]: Yes.

[PROSECUTOR]: —2013?

A-5289-17

[FISHER]: Yes.

[PROSECUTOR]: And about what you and Brian and Carlos did that day?

[FISHER]: Yes.

[PROSECUTOR]: And did you give a description of what happened out there with regard to seeing the Jeep?

[FISHER]: Yes.

[PROSECUTOR]: More than once?

[FISHER]: Yes.

[PROSECUTOR]: And did you give a description of the shooting and how it went down?

[FISHER]: Yes.

[PROSECUTOR]: And did anyone promise you anything in exchange for your statement that day? Did anyone threaten you or coerce you?

[FISHER]: Nobody threatened me. I just was told the name of who shot me.

[PROSECUTOR]: Say that last part again.

[FISHER]: I said nobody threatened me or forced me. I was just told the name of who shot me while I was in the hospital and I told [King].

[PROSECUTOR]: And what was the name that you told [King]?

[FISHER]: The name?

A-5289-17

[PROSECUTOR]:  The name—

[FISHER]:  That I told [King]?

[PROSECUTOR]:  Yes.

[FISHER]:  It was Reck.

[PROSECUTOR]:  Reck?

[FISHER]:  Yes.

[PROSECUTOR]:  Do you know how to spell that?

[FISHER]:  I had spelled it W-R-E-C-K.

[PROSECUTOR]:  Okay.  And prior to June 15th of 2013, did you know a person who is called Reck?

[FISHER]:  No, I didn't.  But Carlos did.

Defense counsel objected and the trial court instructed the jury to "disregard the indication from the witness that Carlos Perry knew or advised him of the identity of the shooter as Reck."  Fisher then confirmed his stance that prior to the shooting he did not know of anyone called Reck.

The assistant prosecutor then questioned Fisher about his identification of defendant's photograph.  Defendant confirmed he signed the bottom of the photo and wrote "Wreck" and another name he had previously identified as the name

26

defendant used when he was Fisher's Facebook friend, "Shootin Shxt."[8] When asked why he wrote the names, Fisher replied, "Because that's . . . what was told to me. Like—this is how I knew his name and everything." When asked why he wrote "shooting, S-H-X-T," this exchange followed:

> [FISHER]: To—like when I told [King] the name and he asked me did I know him, and I told him no, but you can look him up through this. That's his Facebook name. That's what I wrote that for. And he said can you write it down. I wrote it down for him.
>
> [PROSECUTOR]: If you didn't know him, how did you know what his Facebook name was?
>
> [FISHER]: Because when I was in the hospital—Carlos got shot in his leg, so he got released early. He came to visit me and explained to me everything, the situation, why it happened.

Defense counsel again voiced a hearsay objection. After a sidebar conference, the judge instructed the jury:

> All right, members of the jury, I'm . . . allowing for the objection, the statement from this witness where he said Carlos explained what happened. But then after that the witness said something to the effect of, and he explained why it happened. And I'm going to ask you not to consider that at all in your deliberations. That . . . is hearsay which would be offered for its truth. It's

---

[8]  The transcript of Fisher's statement provided in defendant's appendix spells the name written by Fisher as "Shootin shit." We do not see the photograph listed in the index to defendant's appendix, so we do not know the reason for the discrepancy.

barred and you're not to consider it at all in your . . . deliberations. The witness—this witness saying, Carlos explained why it happened.

The assistant prosecutor was not eliciting hearsay testimony from Fisher. She was trying to elicit what Fisher had previously told King: during the shooting, he saw defendant's face; he had seen defendant numerous times during the year prior to the shooting and knew defendant as a Facebook friend and from parties at which defendant was known for his dancing. Fisher also identified "Reck" as the shooter, detailing defendant's movements prior to the shooting and verified his statement by signing a photograph of defendant. When asked how sure he was that the photograph was that of Reck, Fisher told King, "That's him." Fisher had told King, "I'll remember that face though, that's him."

At trial, Fisher recanted his prior statements and identification of defendant as the shooter. And defendant made great use of that recantation by the only State's witness who identified defendant at trial. Defendant did not object. See Macon, 57 N.J. at 341 ("[F]ailure to object may suggest the error was of no moment in the actual setting of the trial."). Indeed, his counsel elicited from Fisher during cross-examination he was "given a name" and that name was Reck; Fisher did not say who gave him the name.

Fisher's recantation caused the State to move to have his hospital-bed statement admitted as substantive evidence under N.J.R.E. 803(a)(1). In a ruling not challenged by defendant, the trial court, in a comprehensive oral opinion, analyzed the State's proffer under the pertinent factors set forth in State v. Gross[9] and admitted the statement. Although defendant agreed that gang references should be redacted, he did not object to the portions of the statement he now claims were inadmissible hearsay:

> In his recorded statement, Fisher told detectives that, seconds before the shooting began . . . Burnett looked at the Jeep and said, "yeah . . . that Reck[]"; and that he had heard that Reck and . . . Perry may been (sic) involved in "a beef in Parkside," but that he and . . . Burnett "didn't have anything to do with it."

The full context of those statements must be analyzed. King asked Fisher if Perry or Burnett[10] said anything as the Jeep approached them. The following ensued:

> [FISHER]: Well B said, he said yeah um, that's Reck.
>
> [KING]: Ok.
>
> [FISHER]: (inaudible)

---

[9] 121 N.J. 1 (1990).

[10] In the statement, Perry is referred to as Sadik, Taneek or Deek and Burnett as B or B-Noise.

[KING]:  So, I'm asking, I'm asking what so does B, and Taneek know, know um Reck also?

[FISHER]:  No, B know him.

[KING]:  Ok, but

[FISHER]:  No.

[KING]:  but Deek cause he,

[FISHER]:  but just like we don't know him, know him, like

[KING]:  But,

[FISHER]:  go (inaudible)

[KING]:  But he know him, ok.

The entire colloquy about the "beef in Parkside" was:

[KING]:  I know.  Did you have a problem with him before this?

[FISHER]:  Huh?

[KING]:  Did any, did you have a problem with him before this?

[FISHER]:  I don't know, I don't know if it's they got something going on but I know that me and the other boy.

[KING]:  didn't have anything to do with it.

[FISHER]:  No.

A-5289-17

[KING]: Or,

[FISHER]: (inaudible) won't do anything.

[KING]: Or do, do you know about if like if it's a beef or something going on between? Anywhere?

[FISHER]: I heard like a beef in Parkside and (inaudible) but I don't know.

Defendant did not object during or after the tape was played for the jury.

During summation, defense counsel argued by the time Fisher gave his hospital-bed statement, "the streets were talking," and Fisher obtained "a lot more information [about the shooting] tha[n] he had on the day of the incident." Counsel pointedly told the jury "[s]omebody gave him the name Reck" and that Fisher testified in court he did not know defendant, "that he just, he made that—the stuff in the statement was untrue. He didn't know [defendant]."

Defendant not only acquiesced to the now-claimed error, he invited it. Generally, under the invited-error doctrine, such choices cannot be appealed. State v. A.R., 213 N.J. 542, 561 (2013). "[I]f a party has 'invited' the error, he [or she] is barred from raising an objection for the first time on appeal." Ibid. The doctrine bars trial errors that defendant "induced, encouraged or acquiesced in or consented to" as grounds for reversal. State v. Harper, 128 N.J. Super. 270, 277 (App. Div. 1974); see also State v. Munafo, 222 N.J. 480, 487 (2015).

31

"The invited-error doctrine is intended to 'prevent defendants from manipulating the system' and will apply 'when a defendant in some way has led the court into error' while pursuing a tactical advantage that does not work as planned." State v. Williams, 219 N.J. 89, 100 (2014) (quoting A.R., 213 N.J. at 561-62).

Moreover, we do not discern that the admission of the hearsay statements, individually or cumulatively, was plain error "clearly capable of producing an unjust result," R. 2:10-2; see also State v. Whitaker, 200 N.J. 444, 465 (2009), particularly when that hearsay played a central role in the defense. "Trial errors which were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal." Harper, 128 N.J. Super. at 277; see also A.R., 213 N.J. at 561. The Court recently "cautioned that 'rerun[ning] a trial when the error could easily have been cured on request[] would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal.'" Singh, 245 N.J. at 13 (alterations in original) (quoting State v. Santamaria, 236 N.J. 309, 404 (2019)). Again, the State did not seek to elicit what others told Fisher; that evidence undermined its case, specifically Fisher's identification of defendant from his hospital bed. We also note the court twice struck Fisher's testimony about what Perry said. Further, although in his statement Fisher said Burnett identified Reck in the Jeep and that Burnett knew

him, he qualified the identification by saying "but just like we don't know him, know him, like"; and Fisher never implicated defendant in the "Parkside beef."

The jury was given an opportunity to assess Fisher's hospital-bed statement and his trial testimony and determine which version was credible. The trial court cogently instructed the jury, mentioning Fisher by name, on prior inconsistent statements, recanting witness statements including those giving statements under police interrogation, and pending criminal charges. The jury was fully apprised on how to assess Fisher's credibility. The court also instructed the jury on Fisher's identification of defendant.

Under the circumstances, absent defendant's objection and tactical use of the hearsay to aid his defense, the admission of the hearsay statements was not "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." Macon, 57 N.J. at 335-36 ("No matter how a test may be stated, the question whether an error is reason for reversal depends finally upon some degree of possibility that it led to an unjust verdict."); see also State v. Melvin, 65 N.J. 1, 18-19 (1974). Likewise, defendant's failure to request a curative instruction regarding Fisher's testimony about what Perry told him—other than those given by the trial court—supports that he planned to use the evidence to his advantage or he viewed any error "was

actually of no moment." State v. Yough, 208 N.J. 385, 400-01 (2011) (quoting Macon, 57 N.J. at 333).

We also apply the plain error standard to defendant's argument, raised for the first time on appeal, that King violated N.J.R.E. 701 and invaded the jury's province by narrating "grainy [video] footage culled from the surveillance camera located across the street from the incident," twice depicting a Jeep, and opining it was the same Jeep, registered to defendant, police later recovered near the crime scene, depriving him of his rights to due process and a fair trial. Defendant avers King's "opinion testimony was on an ultimate issue to be determined by the jury, to wit, whether [defendant] was involved in the homicide," and "was improper because the narration was not based on . . . King's contemporaneous perception of the actual event; it was based on his subjective, post-hoc review of the surveillance video."

Defendant did not object to King's trial testimony. We thus will reverse only if the testimony was "clearly capable of producing an unjust result." R. 2:10-2. "An evidentiary error will not be found 'harmless' if there is a reasonable doubt as to whether the error contributed to the verdict." State v. J.R., 227 N.J. 393, 417 (2017). Moreover, the "prospect that the error gave rise to an unjust result 'must be real [and] sufficient to raise a reasonable doubt as to whether [it]

34

led the jury to a verdict it otherwise might not have reached.'" Ibid. (alterations in original) (quoting State v. Lazo, 209 N.J. 9, 26 (2012)).

We first note defendant argues that King narrated the surveillance video. The video, however, was not played during his testimony. In the only portion of the record cited by defendant in support of this argument, the assistant prosecutor asked King his purpose in having the recovered Jeep police towed; King responded: "Once we looked at the surveillance videos and matched them—compared them to the actual vehicle competent [sic] that this was the actual vehicle used in the shooting, I applied for a search warrant."

The admissible testimony leading up to that statement offers context. King had testified that he viewed the surveillance video and obtained a description from an eyewitness of the vehicle used in the shooting. Referencing a map of the crime-scene area, King described police efforts to canvass the area that resulted in finding "the vehicle fitting the description parked near [the crime scene], that matched the description of the vehicle that was seen in the video." King described the recovered vehicle as a "dark-colored box, older-model Jeep Cherokee," he found was registered to defendant. He explained he had crime-scene detectives photograph the Jeep "[j]ust for identification purposes, in terms

of comparing it to the video surveillance . . . ." He then testified why he had the Jeep towed. He also testified defendant had reported the Jeep stolen.

The Court's recent review of the applicable law explained the difference between lay opinion and "fact testimony." Singh, 245 N.J. at 14-16. Lay opinion under N.J.R.E. 701 "can be admitted only 'if it falls within the narrow bounds of testimony that is based on the perception of the witness and that will assist the jury in performing its function.'" Id. at 14 (quoting State v. McLean, 205 N.J. 438, 456 (2011)). The first of the rule's prongs "requires the witness's opinion testimony to be based on the witness's 'perception,' which [']rests on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing.'" Ibid. (quoting McLean, 205 N.J. at 457). "The second requirement of N.J.R.E. 701 is that lay-witness opinion testimony be 'limited to testimony that will assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue.'" Id. at 15 (quoting McLean, 205 N.J. at 458). The Court reiterated "'[f]act testimony has always consisted of a description of what the officer did and saw,'" and that "'an officer is permitted to set forth what he or she perceived through one or more of the senses.'" Ibid. (quoting McLean, 245 N.J. at 460).

A-5289-17

Applying those tenets, the Court ruled a detective's testimony that the sneakers worn by the perpetrator of a robbery depicted in surveillance footage were similar to sneakers worn by the defendant when he was arrested, see id. at 8, "was proper lay opinion testimony under N.J.R.E. 701," id. at 17-18. Like defendant, the defendant in Singh argued the detective's "statement as to the similarity between the two was improper because the sneakers were admitted into evidence, and the jury was capable, having seen the surveillance video, of comparing the sneakers in evidence to those on the video" and "admitting [the detective's] testimony as lay opinion testimony was therefore improper because the detective was in no better position to evaluate the similarity between the sneakers than the jury." Id. at 19. The Court disagreed, holding N.J.R.E. 701

> does not require the lay witness to offer something that the jury does not possess. Nor does it prohibit testimony when the evidence in question has been admitted, as it was here. . . . We decline to write such an additional requirement into that rule of evidence.
>
> [Ibid.]

The Court noted the detective had seen the sneakers the defendant was wearing when he was arrested. Id. at 20. Because the detective had also seen on the video surveillance footage what defendant was wearing, "his lay witness opinion as to the similarities between the sneakers from the surveillance footage

37

and the sneakers he saw that night was rationally based on his perception." Id. at 19-20. The Court also recognized the detective's testimony was helpful to the jury; based on his "first-hand knowledge of what the sneakers looked like" when the defendant was arrested, he "permissibly testified" the sneakers looked alike. Id. at 20.

The Court rejected the same arguments defendant now makes:

> Simply because the jury may have been able to evaluate whether the sneakers were similar to those in the video does not mean that [the detective's] testimony was unhelpful. Nor does it mean that [the detective's] testimony usurped the jury's role in comparing the sneakers. Indeed, the jury was free to discredit [the detective's] testimony and find that the sneakers in evidence were dissimilar to those on the surveillance video.
>
> [Ibid.]

Notably, King first testified the recovered vehicle "fit" or "matched" the description of the Jeep—an older, dark-colored model with a box shape—not that the recovered Jeep was that seen in the video. He had the vehicle photographed so that it could be compared to the surveillance video; he did not summarily conclude it was the same vehicle.

Nevertheless, like the detective in Singh who saw both the surveillance footage and the defendant's sneakers, King viewed the surveillance footage and

38

the recovered Jeep. His testimony was based on his perceptions and aided the jury—particularly since, as defendant contends, the video was "grainy"—thus satisfying both of N.J.R.E. 701's prongs.

As in Singh, the jury had the surveillance video and stills taken from that footage and could compare them with the recovered Jeep. It was left to the jury to decide if they were the same or similar. Again, the surveillance video was not played when King described what he had seen; he was not narrating what was depicted in the footage. Moreover, King did not testify as to the ultimate issue: that defendant had shot the victims. See ibid. In fact, King never testified defendant was in the Jeep when the shooting occurred or that defendant fired the shots. It was left to the jury to link the Jeep to the shooting, defendant to the Jeep at the time of the shooting and defendant to the actual shooting. The jury also considered that the recovered Jeep was found in close proximity to the crime scene—a fact used by defendant in arguing in summation that if defendant had shot the victims, he would not have parked the Jeep so close to the crime scene, suggesting "whoever brought that Jeep back to that area didn't care whether or not it was located by the police because they didn't have a tie-in to that Jeep"—and that defendant had reported the Jeep stolen. The ultimate issue was left to the jury.

A-5289-17

As such, we do not conclude King's brief testimony: "Once we looked at the surveillance videos and matched them—compared them to the actual vehicle competent [sic] that this was the actual vehicle used in the shooting, I applied for a search warrant," resulted in plain error. To be sure, his jumbled statement "competent that this was the actual vehicle used in the shooting" can be taken as suggestive of defendant's guilt. But viewed in the context of his entire testimony it was not "clearly capable of producing an unjust result." R. 2:10-2.

In a pro se supplemental brief, defendant argues, again for the first time on appeal, that his identification by Fisher from a single photograph shown by King was unduly suggestive, particularly when Fisher did not identify defendant three days prior when shown eight photographs at a separate identification procedure.

Defendant's argument ignores the fact that prior to being shown the single photograph of defendant, Fisher told King he knew "Reck" and explained to King how he knew him from his in-person and Facebook encounters during the year prior to the shootings. Defendant concedes in his merits brief that Fisher told the detectives "that he knew Wreck/Reck for about a year or so, and had seen him several times during that period. He also informed these investigators

40

that shortly after he was shot, and while still in the hospital, he had noticed that Wreck/Reck[']s [F]acebook profile had changed to 'Shootin Shxt.'"

Identification was not an issue in the case until Fisher recanted his statement to King at trial. To that point, Fisher's identification was confirmatory. As the Court explained,

> [a] confirmatory identification occurs when a witness identifies someone he or she knows from before but cannot identify by name. See, e.g., National Research Council, Identifying the Culprit: Assessing Eyewitness Identification 28 (2014) ("Confirmatory Photograph: Police will, on occasion, display a single photograph to a witness in an effort to confirm the identity of a perpetrator. Police typically limit this method to situations in which the perpetrator is previously known to or acquainted with the witness."); Sides v. Senkowski, 281 F. Supp. 2d 649, 654 (W.D.N.Y. 2003) ("parties knew each other previously"). For example, the person may be a neighbor or someone known only by a street name. See Identifying the Culprit, at 22.
>
> [State v. Pressley, 232 N.J. 587, 592-93 (2018).]

Such identifications are "not considered suggestive." Id. at 592.

Defendant did not request a pretrial hearing to challenge Fisher's identification and did not object to its admission at trial. The admission of Fisher's identification was not plain error under the standard we have here oft-repeated. The jury was apprised of both Fisher's identification and his recantation, and it was instructed on how to assess that identification.

41

Although defendant claims Fisher did not select his photograph from the eight he was shown, the record does not support that averment. The CCPO supplemental report prepared by the detective who conducted that procedure, appended to defendant's pro se brief, does not identify whose photographs were shown to Fisher. Indeed, in his brief, defendant states "the record does not reflect . . . King showing the photographic display. Please extract from the record." And the State asserts defendant's photograph was not among those shown to Fisher. It points to King's trial testimony that two fingerprint matches other than defendant's were lifted from the Jeep, prompting King to order two photo arrays generated that included those two persons. Those displays were shown to Fisher; he was unable to identify anyone in either array as being involved in the shooting. Nothing in the record, however, shows that defendant's photograph was included in any array shown to Fisher.

Because the issue was not raised to the trial court, the record is not sufficiently developed to allow review of defendant's argument. As such we decline to consider it. State v. Robinson, 200 N.J. 1, 20 (2009). The same holds true for defendant's cryptic argument "that there was never an orgin [sic] as to where these detectives had produced photograph from . . . ."

In his amended pro se letter brief, defendant argues the trial court "failed to adhere to the procedure for imposing a discretionary consecutive term," improperly weighed the aggravating and mitigating factors and imposed an excessive sentence.

After mergers, the trial court sentenced defendant to forty-five years, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, for the first-degree murder of Burnett (count one), concurrent to a seven-year sentence with forty-two months of parole ineligibility under the Graves Act, N.J.S.A. 2C:43-6(c), for second-degree unlawful possession of a firearm (count five), and a fifteen-year sentence, subject to NERA, for first-degree conspiracy to commit murder (count six), but imposed a consecutive fifteen-year sentence, subject to NERA, for the first-degree attempted murder of Fisher (count two).

We "review sentencing determinations in accordance with a deferential standard. [In our review, we] must not substitute [our] judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70 (2014). Our duty is to assure that the aggravating and mitigating factors found by the court are supported by "competent credible evidence in the record." State v. Roth, 95 N.J. 334, 364 (1984). As directed by the Court, we must (1) "require that an exercise of discretion be based upon findings of fact that are grounded in competent,

reasonably credible evidence"; (2) "require that the factfinder apply correct legal principles in exercising its discretion"; and (3) modify sentences only "when the application of the facts to the law is such a clear error of judgment that it shocks the judicial conscience." Id. at 363-64. Applying a deferential standard of review to the court's sentencing determination, we find no error in the court's identification and balance of the "aggravating and mitigating factors that are supported by competent credible evidence in the record." State v. O'Donnell, 117 N.J. 210, 215 (1989); see also State v. Grate, 220 N.J. 317, 337 (2015).

The court found aggravating factors one, N.J.S.A. 2C:44-1(a)(1) (the "nature and circumstances of the offense" and defendant's role therein, including whether the crime was "committed in an especially heinous, cruel or depraved manner"); three, N.J.S.A. 2C:44-1(a)(3) (the risk that defendant will reoffend); and nine, N.J.S.A. 2C:44-1(a)(9) (the need for deterrence), and determined, "on a qualitative as well as quantitative basis," they "clearly, convincingly and substantially outweigh[ed]" mitigating factors three, N.J.S.A. 2C:44-1(b)(3) ("defendant acted under strong provocation"); five, N.J.S.A. 2C:44-1(b)(5) (the victim induced or facilitated the commission of the crime); and seven, N.J.S.A. 2C:44-1(b)(7) ("defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time" leading up

to the present crime). The trial court fully complied with Rule 3:21-4(g) pointing to specific facts supporting its determination of the aggravating and mitigating factors.

The court based aggravating factor one on the evidence that this was "a planned and premeditated attack on three defenseless victims carried out by the defendant and accomplices" with a specific target—Perry—and that "at least [seventeen] shots were fired . . . on a busy street in Camden at approximately 6:38 p.m." on a mid-June day. The court also considered that Burnett—who was not the intended target—was struck three times and killed, and Fisher and Perry were each struck once.

In finding aggravating factor three, the trial court followed our Supreme Court's guidance that "[a] court's findings assessing . . . the predictive assessment of chances of recidivism . . . involve determinations that go beyond the simple finding of a criminal history and include an evaluation and judgment about the individual in light of his or her history." State v. Thomas, 188 N.J. 137, 153 (2006). The trial court noted defendant's statement that his actions were impelled by his belief that Perry had killed his friend and had shot at defendant. The court also considered that defendant had "implied that he was justified in taking this action as a payback, and he was not concerned about the

45

fact that the two people standing near . . . Perry, the target, were also struck by bullets and that one died," and that defendant was "not remorseful." The court further explained "[t]he extremely violent nature of the defendant's actions here, including the callous involvement of bystanders in the shooting attack, support the proposition that there is a high risk that the defendant will re-offend in a similar way."

The evidence supporting the high risk found by the court prompted it to also find there was a "correspondingly great" need to deter him and "other people inclined to engage in the same manner of street violence." Thus the trial court followed the Court's directive that a determination of factor nine involves not only "a 'qualitative assessment' of the risk of recidivism, but 'also involve[s] determinations that go beyond the simple finding of a criminal history and include an evaluation and judgment about the individual in light of his or her history.'" Fuentes, 217 N.J. at 78 (alteration in original) (quoting Thomas, 188 N.J. at 153). The trial court pointed to specific facts supporting its conclusion that there was a need to deter both defendant and the general public from engaging in future criminal behavior. See id. at 78-79; see also State in the Interest of C.A.H. & B.A.R., 89 N.J. 326, 337 (1982) (determining that "demands for deterrence are strengthened in direct proportion to the gravity and

harmfulness of the offense and the deliberateness of the offender"); State v. Rivers, 252 N.J. Super. 142, 153-54 (App. Div. 1991) (recognizing a defendant's lack of remorse as one of the many reasons supporting aggravating factor nine).

The court admeasured "heavy weight" to aggravating factor one and "high weight" to three and nine "together." The court declined to find aggravating factor six, N.J.S.A. 2C:44-1(a)(6) (the extent of "defendant's prior criminal record and the seriousness" of his convicted offenses).

In finding mitigating factors three and five, the trial court gave "defendant the benefit of the doubt that he received some credible information" that Perry had killed his friend and shot at him. The court accorded "low weight" to those factors in that those "incidents apparently had occurred months in the past" and "could not reasonably be expected to have had a significant effect on the defendant at the time of the defendant's offense in the present case." The court also found mitigating factor seven but gave it "low weight" noting defendant's single 2012 juvenile adjudication and defendant's age—eighteen years old—at the time of the crimes. The court also considered defendant's age but gave it "low weight, considering in the end he was an adult" when he shot at and killed or injured the victims.

We discern no abuse in the court's finding of the applicable sentencing factors and its weighing of those factors; the court well explained its reasoning and based its findings on competent record evidence.

We likewise find no abuse in the trial court's decision to impose a consecutive sentence for the attempted murder of Fisher.

In State v. Yarbough, 100 N.J. 627, 643-44 (1985), superseded by statute in part, N.J.S.A. 2C:44-5(a), as recognized in State v. Cuff, 239 N.J. 321 (2019), our Supreme Court established factors that a sentencing court must consider when deciding whether to impose consecutive sentences:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
>> (a) the crimes and their objectives were predominantly independent of each other;
>>
>> (b) the crimes involved separate acts of violence or threats of violence;
>>
>> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as

48

> to indicate a single period of aberrant behavior;
>
> (d) any of the crimes involved multiple victims;
>
> (e) the convictions for which the sentences are to be imposed are numerous
>
> (4) there should be no double counting of aggravating factors;
>
> (5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense[.]

See also State v. Torres, __ N.J. __, __ (2021) (slip op. at 32, 34) (instructing trial courts "performing the Yarbough fairness assessment must be mindful that aggravating and mitigating factors and Yarbough factors, as well as the stated purposes of sentencing in N.J.S.A. 2C:1-2(b), in their totality, inform the sentence's fairness" which "cannot be divorced from consideration of the person on whom it is imposed. . . . Assessing the overall fairness of a sentence requires a real-time assessment of the consequences of the aggregate sentences imposed").

The court carefully reviewed each of the Yarbough factors and recognized they, particularly factor three's subparts, should be applied qualitatively, not just quantitatively, and consecutive sentences may be imposed even though a

majority of the subparts support concurrent sentences.  State v. Carey, 168 N.J. 413, 427-28 (2001).

The court found the crimes "were not predominantly independent of one another because all of the offenses relate to a single shooting episode lasting less than one minute, approximately" and they were not "committed at different times or separate places"; confirmed it was "taking care" to avoid double-counting the aggravating factors; and was "mindful" to "avoid double[-]counting where the basis for convictions is the existence of multiple victims."  It also considered the murder and two attempted murders involved separate acts of violence resulting in three victims being shot, and defendant faced sentencing on six convictions with sentences imposed on four counts after mergers that included the attempted murder of the third victim, Perry.  The court also set forth the weight it gave to each of the factors.

The trial court acted within its discretion in imposing the consecutive sentence.  Notably, the court was "mindful of the real time consequences of the aggregate sentence," imposing just one consecutive sentence notwithstanding that there were three victims and multiple counts, and imposed midrange sentences for each of the consecutive sentences.  See State v. Abdullah, 184 N.J. 497, 515 (2005) (instructing trial courts to consider the fairness of the overall

sentence).  We see no reason to disturb the trial court's sentence which properly evaluated the Yarbough factors.  See State v. Miller, 205 N.J. 109, 129 (2011).  The court's thoughtful sentencing analysis, based on competent, credible evidence, resulted in an aggregate sixty-year sentence for a murder and two attempted murders.

In the final analysis, we will not second-guess or intervene in a trial judge's sentencing decision if the sentence was imposed in accordance with the sentencing laws and guidelines.  State v. Jabbour, 118 N.J. 1, 5-6 (1990).  The judge imposed an entirely appropriate sentence well within the bounds of accepted legal principles.  The sentence does not shock the judicial conscience.  See O'Donnell, 117 N.J. at 215-16.

Lastly, we are unpersuaded by defendant's Rule 2:6-11(d) argument that the enactment of N.J.S.A. 2C:44-1(b)(14) requires reversal because "[t]he trial [court's] concession that he would give 'low–low' consideration, if any, to [defendant's] age was inconsistent with the statute."

When defendant was sentenced in May 2018, a defendant's age was not an independent mitigating factor.  The additional mitigating factor implemented by the Legislature provides a trial court may consider that a "defendant was under [twenty-six] years of age at the time of the commission of the offense."

51

N.J.S.A. 2C:44-1(b)(14). The Legislature did not address whether the amendment adding mitigating factor fourteen should be given retroactive application, but it provided an effective date of October 19, 2020. The effective date evidences the Legislature's intent that the law should be applied prospectively. See State v. J.V., 242 N.J. 432, 435 (2020); Pisack v. B & C Towing, Inc., 240 N.J. 360, 370-71 (2020).

We further note the trial court found defendant's youth as a mitigating factor. Thus, we reject defendant's contention that the Legislature's enactment of the new statute, N.J.S.A. 2C:44-1(b)(14), requires reversal.

To the extent not here addressed, we determine defendant's remaining sentencing arguments to be without sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed in part; the trial court's order settling the record is vacated and the matter is remanded for a hearing to address that issue and for the trial court's reconsideration, based on the results of that hearing, of its decision with regard to defendant's motion to suppress his statements. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5289-17